STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
MATTHEW JAMES HALE, Jr., DEFENDANT-APPELLANT.

Argued June 1, 1965—Decided July 7, 1965.

*Mr. Salvatore J. Avena* argued the cause for appellants (*Mr. Joseph Pierce Lodge,* on the brief).

*Mr. Richard A. Koerner,* Deputy Attorney General, argued the cause for respondent (*Mr. Arthur J. Sills,* Attorney General of New Jersey, attorney).

The opinion of the court was delivered by

SCHETTINO, J. Defendant, Matthew James Hale, Jr., was charged and tried for the murder of his wife on or about midnight May 28, 1961. The jury returned a verdict of guilty in the first degree with a recommendation of life imprisonment. In addition to the brief filed in this Court by his counsel, defendant has filed a brief *pro se.*

The facts surrounding the murder are deduced from defendant's oral testimony at trial, his written confession (no objection to which was raised at trial) and the testimony of others to whom he stated the circumstances of the murder. No other person witnessed the incident.

On the morning of May 28, 1961 defendant had an argument with his wife about her manner of keeping house and his drinking. At lunch they apparently resolved their differences

and made up. According to defendant there were no hostile feelings at dinner.

While they were eating dinner a neighbor called Hale and asked if he had any beer to spare. Hale replied that he did not, but that he would see if his brother, Pressley, did. He called Pressley, who informed him that he had some beer. Hale went to Pressley's home, got the beer, then went to the neighbor's house where he had three or four cans of beer and double shots of gin. Sometime later Hale received a call from his wife asking him to return home in order to watch television with the children.

Hale returned home between 9:30 and 9:40 P. M. and read a nursery rhyme to their three children and then they were taken to bed. He thereafter began working on a rifle which he had been converting into a sporting gun, had some more beer and watched television. Meantime his wife was out in the kitchen cleaning up. She then went in to bathe.

Hale testified that he became quite depressed, wrote some letters and had the feeling he was going to commit suicide. The letters he wrote spoke of caring for the children in the future but made no mention of his wife's part in the future care of the children.

Defendant then left the living room, went into the bedroom, got a .22 caliber semi-automatic rifle, loaded it with 8 to 10 bullets and returned to the living room where he saw his wife lying on the couch. He walked over to his wife and told her he was going to shoot her. She replied: "I think you will" or "I know you will." She then asked to see the children, but defendant said "no." She started walking toward the bedroom and defendant started shooting. Hale claimed he felt as if he were shooting at the wall and ceiling, and that he could only feel the gun going off but could not hear the shots. His wife reached the bedroom and shut the door. He stated that he tried to go into the bedroom but had to exert some force to push the door open, as his wife was lying on the floor and against the door. Hale lifted her onto the bed and covered her up.

Thereafter, defendant went to the kitchen, had another beer, washed up, changed his clothing, awakened the children and put them into the car. He took the youngest boy to the home of his brother, David, and the other boys to David's in-laws. He asked them to care for the children while he went to look for his wife who, he said, had left after an argument.

Hale went to Pressley's home where he had a beer. He then went upstairs, got his mother and told his mother and brother that he had killed his wife. Pressley thereupon called Ernest Sever, an attorney and friend, and asked him to come over at once. When Sever arrived he was told of the crime. Pressley testified that they called Sever for "legal advice." He advised them to have a doctor go to the Hale residence. Sever said that after talking about 40–45 minutes, he accompanied defendant and David to the Edgewater Park State Police Barracks, where defendant turned himself in to the police.

Sever also testified that when he first saw defendant, defendant seemed to be somewhat under the influence of alcoholic beverages but defendant was not in a condition which would meet the definition of "drunk" as required for a conviction for drunken driving. Sever also stated that while he was at Pressley's home, defendant consumed "one bottle of beer and an undetermined amount of blended whiskey." During the trip to the State Police Barracks Hale was upset, crying and at times rather incoherent, but according to Sever, "there was no doubt that defendant knew that he killed his wife."

After surrendering himself to the State Police, defendant was interviewed in David's presence by the chief of the Burlington County detectives. The chief testified that Hale readily admitted his guilt. The chief suggested that he call defendant's pastor who was also the chief's pastor. Defendant told the chief that he would like to talk to the pastor. When they were unable to reach the pastor by telephone, David was sent to get him. Meanwhile defendant was taken to Burlington City Police Headquarters in Burlington. Sandwiches and

coffee were brought for defendant, but he declined them. The pastor arrived at the headquarters and talked with defendant for a short period of time.

Thereafter, defendant was taken to the county detective office where a formal statement was taken in the presence of two other detectives and a female stenographer. Before the interrogation was started defendant was formally warned by the chief of his constitutional right to remain silent. The statement was begun at 5:45 A.M. and completed at 6:20 A.M. The statement was later transcribed and defendant signed it at 2:00 P.M.

After giving the statement, defendant was taken back to the Burlington City Police Headquarters. At 5:00 P.M. a preliminary hearing was held in the Burlington City Magistrate's Court. Defendant was held over for action of the grand jury which later returned an indictment for murder under *N. J. S.* 2A:113–1, 2.

The defense did not contest the fact that Hale shot his wife. Defendant so confessed and testified on the stand. And Pressley recounted how defendant had admitted the crime to him shortly after arrival at his home. The basic defense was insanity. A corollary endeavor by defendant was an attempt to show that there was no basis for a finding of guilty of murder in the first degree.

The prosecution's theory of premeditation and deliberation was as follows. Defendant's letters written shortly before the murder left his possessions to his brother, instructed his brother to care for the children, made no mention of his wife and thus an inference could be drawn that defendant was at that time contemplating the murder of his wife. Moreover, the State submitted defendant's statement which contained his recital that he never kept a gun loaded, and therefore, had taken time out to go into another room to get the gun and to put 8 to 10 shells in the murder weapon. He then returned to the living room to shoot his wife.

Additionally, the State offered the following theory as to the actual sequence of firing of the shots. The first bullet

struck her through the cheek as she was leaving the living room and entering the bedroom; the second bullet penetrated the bedroom door and struck her in the brain as she leaned with her back against the bedroom door and, as to the final shot, it was fired into the victim by defendant in the bedroom as he stood over her.

Medical testimony was introduced at trial by the State showing that decedent was struck by three bullets; one, through the left cheek, which broke the fourth and fifth upper teeth; the second, behind the right ear, which did serious damage to the base of the brain and the last, extended downward and medially from the left shoulder. According to the medical examiner the bullet which entered the base of the brain severed the medulla connections and put an end to all voluntary movement so that the victim "would drop like a rock." As to the wound to the shoulder, he stated it had to have been inflicted while she was on the floor with defendant standing over her for otherwise "it would have to be fired about the height of the ceiling if she were erect." Hale specifically denied shooting his wife as she lay on the bedroom floor but conceded that he had fired a shot through the bedroom door.

When the defense indicated that blood was found only in the bedroom and not in the living room where the first shooting allegedly took place, the medical examiner stated that the first and third wounds could have been received without blood appearing on the floor, and that decedent could have continued running following the wound first inflicted.

The defense introduced testimony concerning Hale's background aimed at showing defendant's inability to commit the crime because he was insane at the time of the crime, (cf. State v. DiPaolo, 34 N. J. 279 (1961) cert. denied 368 U. S. 880, 7 L. Ed. 2d 80 (1961)) and on the issue of punishment. Cf. State v. Mount, 30 N. J. 195 (1959). Hale had been in trouble at an early age as a result of breaking into a school and a church. He began drinking alcohol in his teens. Hale never finished high school, enlisting in the Marines following

his third year. Although he served with some distinction in Korea, he was twice absent without leave when not on combat duty. While he was able to hold a job on his return from service, he continued his excessive drinking habit. He talked of ending his life; on one occasion, slashed his wrist, while on another, threatened to shoot himself. Besides threatening to do harm to himself, he threatened Pressley, a paraplegic, and discussed robbing two business establishments.

On several occasions defendant received psychiatric treatment spending six weeks in a private hospital in Pennsylvania but failing to follow out-patient treatments. Several psychiatrists testified for defendant and one for the prosecution. All agreed that defendant was psychologically disturbed and emotionally unstable. One of defendant's doctors testified that at the time of the murder, defendant had lost contact with reality. All felt that he was in need of psychiatric care and in its absence his condition was deteriorating.

Two of the experts opined that defendant knew the nature and quality of his acts and the difference between right and wrong, one felt that while defendant probably knew what he was doing, he was unable to distinguish between right and wrong at the time of the crime and the fourth one stated that he was unable to express an opinion.

██ Defendant contends that the trial court erred in admitting into evidence over objection a photograph of the body of the victim which showed some bleeding from the head and a nightgown pulled up around her neck. He does not contest the picture's relevancy but relies instead on its capacity to evoke prejudice. We have stated that if the photograph is probative of some material fact, we will not disturb a trial court's ruling unless it appears that the picture's capacity for prejudice plainly outweighs its probative force. *State v. Pacheco,* 38 *N. J.* 120, 130–131, 183 *A. 2d* 54 (1962); *State v. Smith,* 27 *N. J.* 433, 438 (1958), *cert.* denied 361 *U. S.* 861, 80 *S. Ct.* 120, 4 *L. Ed. 2d* 103 (1959); *State v. Walker,* 33 *N. J.* 580 (1961), *cert.* denied 371 *U. S.* 850, 83 *S. Ct.* 89,

9 *L. Ed.* 2d 86 (1962). The circumstances here do not permit a finding of error.

 Defendant also claims he was denied his constitutional rights by not having counsel assigned to represent him at the preliminary hearing held the day after the murder. We find applicable here the remarks of Mr. Justice Jacobs in *State v. Dennis,* 43 *N. J.* 418, 426–427 (1964), wherein he stated for the Court:

"* * * The record of the trial contains no mention whatever of any happenings at the preliminary hearing which, under our State practice, was not a critical stage in the proceedings. [citations] Unlike *Hamilton v. [State of] Alabama,* 368 *U. S.* 52, 82 *S. Ct.* 157, 7 *L. Ed.* 2d 114 (1961), Warren [Dennis] lost no defenses by virtue of the proceedings before the magistrate; unlike *White v. [State of] Maryland,* 373 *U. S.* 59, 83 *S. Ct.* 1050, 10 *L. Ed.* 2d 193 (1963), no plea of guilty was received in evidence; and unlike *Pointer v. State,* 375 *S. W.* 2d 293 (*Tex. Ct. Crim. App.* 1964), *cert.* granted 85 *S. Ct.* 88 (Oct. 13, 1964), no testimony taken before the magistrate was presented at the trial. * * *."

Such is the case here and we find no basis for error.

Defendant requests the Court to abandon the M'Naghten rule as a test for insanity in light of its age and inconsistency with modern psychiatric principles. On May 17, 1965 we reaffirmed and refused to change our view. *State v. Sikora,* 44 *N. J.* 453 (1965).

Defendant also contends that the trial court committed plain error because it allegedly instructed the jury that it could infer that a guilty verdict could be returned simply by finding that the State had merely proved one element of the crime. Defendant refers to the word "elements" which we have underscored in the following charge:

"Now, ladies and gentlemen, if on the other hand you find that one or more of the elements of murder, as I have defined it to you, have been established by the State beyond a reasonable doubt, then your verdict will be guilty; but here again, your verdict will be one of three—either you will find the defendant guilty of murder in the second degree or you will find the defendant guilty of murder in the first degree with recommendation of life imprisonment, or you will

find the defendant guilty of murder in the first degree without such recommendation.

Now, here there are two extremely important statutes which I must read to you. I have already read to you the statute regarding the degrees of murder, and I have discussed at length distinguishing between second degree and first-degree murder and the presumption which must be overcome before you can, before the crime of second-degree murder can be raised and of first-degree, but you will recall that the statute provides that a jury finding a person guilty of murder shall designate by their verdict whether it be murder in the first or in the second degree.

Now, if you arrive at the point where you conclude that the State has established beyond a reasonable doubt that this defendant was guilty of murder in the first degree, then you must consider the matter of punishment, because in this particular instance the designation of punishment is left to the jury."

 To ascertain whether the trial court committed prejudicial error, we do not limit our view to a single portion of the charge asserted as error. *State v. Gallichio*, 44 *N. J.* 540 (1965). Rather we view the charge in its entirety in order to determine its overall effect. *State v. Williams*, 39 *N. J.* 471, 486 (1963), *cert.* denied 374 *U. S.* 855, 83 *S. Ct.* 1924, 10 *L. Ed. 2d* 1075 (1963); *State v. Hipplewith*, 33 *N. J.* 300, 317 (1960). Viewing the entire charge it is clear that the use of this word was just a slip, for clearly "degrees" was intended and the jury must have so understood it.

In *State v. Tansimore*, 3 *N. J.* 516 (1950), the trial court once omitted from its charge on the controlling law of first degree murder, the requirements of deliberateness and premeditation. We affirmed the conviction pointing out that (at *p.* 525):

"Both before and after the particular sentence criticized, the court repeatedly instructed the jury before it could convict of murder in the first degree it was essential to find the defendant willfully, deliberately and with premeditation killed the deceased."

 Moreover, had a misimpression as to the controlling law been conveyed, experienced trial counsel would certainly have alerted the trial court to its error. As no objection to the charge was interposed at the time of trial, defendant must

demonstrate that the error possessed a clear capacity to bring about an unjust result. *R. R.* 1:5–1(a); *State v. Williams,* 39 *N. J.* 471, 485 (1963). The failure to object points up the fact that the inadvertent use of one erroneous word did not detract from the clear exposition of the controlling law which the charge as a whole conveyed. We therefore find no basis for plain error.

Defendant also claims plain error in the admission into evidence of the bedroom door which was seized without a search warrant the day after the murder.[1]

We note that a photograph of the door taken the day of the murder had previously been proffered as evidence and in answer to the trial court's inquiry as to its requested admission, defense counsel responded "no objection." As to the admission of the door itself in evidence, defense counsel obviously saw no prejudice to defendant for he stated specifically that he had "no objection" to its admission. Furthermore, there were several police officers who had visited defendant's home, had viewed the door and presumably were ready to testify as to its condition. It is clear that the admission of the door did not have the "clear capacity to bring about an unjust result." *R. R.* 1:5–1(a); *State v. Williams, supra,* at *p.* 485. We find no basis for applying the plain error rule.

We next consider the points raised in the *pro se* brief. Defendant claims that his confession is inadmissible because it was obtained in the absence of counsel, citing *Escobedo v. State of Illinois,* 378 *U. S.* 478, 84 *S. Ct.* 1758, 12 *L. Ed. 2d* 977 (1964). The circumstances surrounding this confession are a far cry from those in *Escobedo.* Indeed, Hale had ample opportunity for legal advice; although the record does not indicate clearly what happened between them, Ernest Sever, the attorney and friend, talked with defendant for 30 to 45 minutes and thereafter accompanied him to police headquar-

---

[1] We note that the case was tried before *R. R.* 3:2A–6 was adopted on Dec. 6, 1962 to be effective January 2, 1963. This rule requires a motion to suppress evidence to be made in advance of trial and if not defendant is deemed to have waived his objection.

ters. Although Sever never technically acted as Hale's counsel, he was still present to give him the advice needed. Moreover, Pressley Hale testified that Sever was called for "legal advice."

We add that Hale was also accompanied to the police station by his brother, David, and thereafter, he talked with his pastor.

We find no merit in this point.

 In his *pro se* brief defendant also claims the trial court denied him the right to retain counsel of his choice. Mere recital of the facts establishes the baselessness of the charge.

The cause was scheduled for trial for May 21, 1962. On May 17, about one year after counsel had been assigned to defendant on the ground of indigency, defendant moved for time to obtain substitution of counsel. Defendant's only explanation for the long delay in seeking private counsel was that due to the lack of explanation by the trial court, he was under the impression that once counsel had been assigned he was precluded from retaining his own counsel. Hale also claims that he was never asked about his finances or instructed on his right to counsel. Defendant told the trial court at the hearing on the motion that his family was in the process of retaining private counsel because he was dissatisfied with assigned counsel. Hale conceded that part of his dissatisfaction with counsel was based on the feeling that a court-assigned attorney "isn't genuinely interested in the defense." The court granted Hale's motion, postponed the trial, but indicated its desire to have the trial begin on June 4 so that it would be completed before the summer recess.

On May 24, 1962 defendant again appeared and notified the court that as yet no counsel had been retained. The court gave Hale until May 28 to obtain his own counsel. Upon defendant's failure to do so, the court indicated that counsel would be assigned and as it found nothing improper in the conduct of the present counsel, it would continue their assignment. When the trial began on June 12, 1962, Hale was

asked in chambers by the trial court to state for the record whether, after consulting with assigned counsel, defendant was "satisfied and ready and willing to proceed to trial with your assigned counsel." Hale replied, "Yes, sir, I am satisfied and willing to proceed, your Honor."

Defendant's present excuse is that he signified his acceptance of counsel in an effort "to make the best of a bad situation" because the trial court allowed his family inadequate time to retain new counsel and because the trial court was pressured by an article in a local paper scoring the delays in Burlington County criminal prosecutions.

We find no merit in defendant's claim.

In his *pro se* brief defendant additionally argues that his assigned counsel was "dilatory, ineffective and negligent" in the preparation and trial of the case. From our examination of the record we find this contention groundless. See *State v. Dennis,* 43 *N. J.* 418, 427–428 (1964).

Affirmed.

*For affirmance* — Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN —7.

*For reversal*—None.