693 A.2d 1272

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT CROSS–
APPELLANT, v. HORACE BRANCH, DEFENDANT–
APPELLANT CROSS–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Submitted May 14, 1997—Decided June 4, 1997.

308

Before Judges SHEBELL, BAIME and BRAITHWAITE.

*Susan L. Reisner,* Public Defender, attorney for appellant (*Thomas J. Largey,* designated counsel, and on the briefs).

*Clifford J. Minor,* Essex County Prosecutor, attorney for respondent (*Raymond W. Hoffman,* Assistant Prosecutor, of counsel, and on the briefs).

SHEBELL, P.J.A.D.

In December 1993, defendant, Horace Branch, was charged in thirteen counts of a fifteen count indictment as follows: first degree armed robbery of Randolph Moseley (*N.J.S.A.* 2C:15–1) (Count One); first degree felony murder of Randolph Moseley (*N.J.S.A.* 2C:11–3a(3)) (Count Two); first degree murder of Randolph Moseley (*N.J.S.A.* 2C:11–3a(1) & (2)) (Count Three); first degree armed robbery of Philip Murphy (*N.J.S.A.* 2C:15–1) (Count Four); first degree armed robbery of Kenneth Dortch (*N.J.S.A.* 2C:15–1) (Count Five); fourth degree pointing of a firearm at Eddie Ratchford (*N.J.S.A.* 2C:12–1b(4)) (Count Six); third degree unlawful possession of a weapon (*N.J.S.A.* 2C:39–5b) (Count Seven); second degree possession of a weapon for an unlawful purpose (*N.J.S.A.* 2C:39–4a) (Count Eight); fourth degree possession of hollow point bullets (*N.J.S.A.* 2C:39–3f) (Count Nine); fourth degree resisting arrest (*N.J.S.A.* 2C:29–2) (Count Ten); third degree unlawful possession of a weapon (*N.J.S.A.* 2C:39–5b) (Count Thirteen); second degree possession of a weapon for an unlawful purpose (*N.J.S.A.* 2C:39–4a) (Count Fourteen); and fourth degree unlawful possession of hollow point bullets (*N.J.S.A.* 2C:39–3f) (Count Fifteen).

In the same indictment, Patricia Lee was charged with third degree unlawful possession of a weapon (*N.J.S.A.* 2C:39–5b) (Count Eleven) and second degree possession of a weapon for an unlawful purpose (*N.J.S.A.* 2C:39–4a) (Count Twelve). Lee did not stand trial, but was instead given use-immunity to testify against defendant.

On November 14, 1994, following a six-day trial, defendant was found guilty of first degree felony murder (*N.J.S.A.* 2C:11–3a(3))

(Count Two); first degree aggravated manslaughter (*N.J.S.A.* 2C:11–4.a(1)) (Count Three); fourth degree pointing of a firearm (*N.J.S.A.* 2C:12–1b(4)) (Count Six); third degree unlawful possession of a weapon (*N.J.S.A.* 2C:39–5b) (Count Seven); second degree possession of a weapon for an unlawful purpose (*N.J.S.A.* 2C:39–4a) (Count Eight); fourth degree possession of hollow point bullets (*N.J.S.A.* 2C:39–3f) (Count Nine); fourth degree resisting arrest (*N.J.S.A.* 2C:29–2a) (Count Ten); third degree possession of a semi-automatic handgun without a permit (*N.J.S.A.* 2C:39–5b) (Count Thirteen); second degree possession of a weapon for an unlawful purpose (*N.J.S.A.* 2C:39–4f) (Count Fourteen); and fourth degree possession of hollow point bullets (*N.J.S.A.* 2C:39–3f) (Count Fifteen).

On December 13, 1994, the trial judge set aside the conviction for felony murder returned by the jury on Count Two. On Count Three, aggravated manslaughter, defendant was sentenced to an extended term of life imprisonment with twenty-five years parole ineligibility. The judge imposed the remaining sentences as follows: on Count Six, defendant was sentenced to a consecutive term of eighteen months; on Count Seven, a consecutive term of ten years, with five years parole ineligibility; on Count Nine, an eighteen month consecutive sentence; on Count Ten, an eighteen month consecutive sentence; Counts Eight and Fourteen were merged with Count Three; Count Thirteen was merged with Count Seven, and Count Fifteen was merged with Count Nine. The court imposed a total of $500 V.C.C.B. penalties and credited the defendant with 405 days of jail credit.

Defendant filed a Notice of Appeal, and the State filed a Cross–Appeal *Nunc Pro Tunc.*

On appeal, the defendant argues:

**Point One**

A Plainclothes Detective Tackled The Defendant And Thereby Subjected Him To An Unreasonable Seizure.

Subpoint (a) Defendant Had A Reasonable Expectation Of Privacy.

Subpoint (b) The Defendant Was Subjected To An Unconstitutional Seizure & All Evidence Discovered As A Result Of That Illegal Seizure Must Be Suppressed.

**Point Two**

Count Ten Of The Indictment Did Not Provide Sufficient Notice To Allow The Defendant To Prepare A Defense. (Not Raised Below)

**Point Three**

The Court Erred When It Did Not Grant Its *Sua Sponte R.* 3:18–1 Motion For Judgment Of Acquittal On Count Ten Of The Indictment.

**Point Four**

The Defendant Was Denied A Fair Trial When The Court:

Subpoint (a) Failed To Provide Adequate Guidance On The Law Regarding Aggravated & Reckless Manslaughter. (Not Raised Below)

Subpoint (b) Failed To Properly Charge The Jury On Self–Defense (Not Raised Below)

Subpoint (c) Failed To Explain The Law In The Context Of The Material Facts. (Not Raised Below)

Subpoint (d) Failed To Answer The Jury's Questions Concerning A Witness.

**Point Five**

The Court's Failure To *Sua Sponte* Charge The Jury With Passion–Provocation Manslaughter, *N.J.S.A.* 2C:11–4(b)(2) And Assault, *N.J.S.A.* 2C:12–1(a)(2) Denied The Defendant A Fair Trial. (Not Raised Below)

**Point Six**

The Court Erred When It Denied Defendant's *R.* 3:18–2 Motion Since The Jury's Verdict Was Against The Weight Of The Evidence On Counts Three, Six, Seven, Eight, Nine, Ten, Fourteen & Fifteen.

**Point Seven**

The Court's Admission Of Three Autopsy Photos Of The Victim Was Prejudicial And Inflammatory And Served To Deny The Defendant A Fair Trial.

**Point Eight**

The Court Imposed Sentences That Did Not Comply With The Guidelines And Was Both Excessive & Shocking To The Judicial Conscience.

Subpoint (a) Before Imposing An Extended Term Pursuant To *N.J.S.A.* 2C:43–6(c), The Court Did Not Hold A Hearing Under *N.J.S.A.* 2C:43–6(d) To Determine If The Defendant Was A Second Offender Under The *Graves* Act.

Subpoint (b) Before Imposing The Maximum Extended Term & Period Of Parole Ineligibility, The Court Failed To Balance Sentencing Factors To Determine The Base Term And Period Of Parole Ineligibility.

Subpoint (c) The Court Failed To Follow The Sentencing Guidelines When It Imposed Terms Of Imprisonment On Counts Six, Seven, Nine & Ten.

Subpoint (d) The Court Imposed An Illegal Sentence On Count Seven.

Subpoint (e) The Court Did Not Explain Its Reasons For Imposing Four Consecutive Sentences.

Subpoint (f) The Court's Sentence Was Excessive And Shocking To The Judicial Conscience.

**Point Nine**

It Was Plain Error To Omit Self–Defense From The Verdict Sheet. (Not Raised Below)

The defendant filed a *pro se* supplemental brief urging:

POINT I THE PROSECUTOR AMENDMENT OF COUNT 10 TO THE IN-DICTMENT WITHOUT THE GRAND JURY CONSENT VIOLATES DEFEN-DANT SUBSTANTIAL RIGHTS TO DUE PROCESS OF LAW. CONST. AMEND. 5, 14. (NOT RAISE BELOW)

POINT II THE STATE FAILED TO SUSTAIN ITS BURDEN THAT DEFEN-DANT SHOT ANYONE BY FAILING TO ESTABLISH A CHAIN OF CUSTO-DY OF THE BULLETS (NOT RAISE BELOW)

POINT III THE TRIAL COURT FAILED TO GIVE AN INSTRUCTION ON UNANIMITY OF THE JURY'S VERDICT, TO NOT COMPROMISE OR DO VIOLENCE TO ONE'S INDIVIDUAL JUDGMENT OR CONSIDERATION (NOT RAISE BELOW)

The State's cross-appeal argues that defendant's conviction on Count Two for felony murder should be reinstated.

Detective Moraes of the Newark Police Department testified at trial and at the suppression hearing as to the events leading up to the defendant's arrest. On November 5, 1993, Moraes responded to 262 Shepard Avenue in Newark after receiving information from a confidential informant about a person armed with a concealed weapon. Upon arriving at the scene, the detective, accompanied by other officers, saw two males standing on the corner of Shepard and Goodwin. Moraes separated himself from the other officers and entered the courtyard of 268/262 Shepard. He then observed defendant who fit exactly the description of the reportedly armed individual.

Moraes testified that defendant, who was walking towards him, changed his direction upon observing him and began walking away. The detective called out to defendant, identified himself as a police officer, and asked defendant to stop. Instead, defendant fled to 262 Shepard Avenue with Moraes in pursuit and entered an apartment building. The detective testified that as the defendant

was running he was holding something in place at the small of his back, in his waistband. Based on the information that the suspect was armed and his own observations, Moraes pursued defendant and eventually tackled him on the first landing of the stairs. He stated that his "purpose was so that I would not lose sight of him if he turned the corner and ran up an additional landing and possibly reached for supposedly what was a weapon, what I believed was a weapon."

After tackling defendant to one knee, Moraes radioed his partners, at which point defendant reached around to his back, removed a handgun, and cocked it. The detective grabbed defendant's arms, forcing him to drop the gun, and the two fell down the stairs as they scrambled for the weapon. The other officers arrived as they landed at the bottom of the stairs, and together they secured the suspect. The weapon was retrieved from the first landing.

After receiving the above testimony at the suppression hearing, the trial court concluded that the State demonstrated probable cause existed to apprehend the defendant based on the matching description of the defendant from the informant and from the detective's own observations of the defendant's actions.

At trial, Philip Murphy testified for the prosecution that on November 4, 1993, at approximately 6:30 a.m., he was at 260 Prince Street in Newark acting as a look-out for an individual who was selling drugs. According to Murphy, at this time defendant and Ken Dortch A/K/A "Hassan" approached him and inquired about purchasing cocaine. When Murphy retrieved the cocaine from a dealer inside the building and returned with the drugs, defendant pulled a gun and directed Murphy to accompany defendant and Dortch into the building. There, defendant ordered Murphy, Dortch, and the other individuals in the hallway against the wall, stating: "this is a stick-up." Defendant asked where the "stash" was and Murphy volunteered to get the drugs from a hiding place upstairs. Ten to fifteen seconds after Murphy went upstairs, he heard gunshots. After an additional ten to fifteen

seconds he returned downstairs and observed Randolph Moseley on the ground bleeding. Murphy said that Patricia Lee was armed that day and that she had wondered aloud, after the shooting, whether she had shot Moseley.

Dortch testified that he was helping other people sell cocaine when defendant approached him and inquired about the possibility of buying some. According to Dortch, he directed defendant to the front of the building where they encountered Murphy. When Murphy went inside the building, defendant robbed Dortch of $50 at gunpoint and warned him not to say anything. Upon Murphy's return, defendant allegedly pulled out his gun again and forced them into the hallway of the building. Dortch estimated there were six people in the hallway, including himself, and testified that the defendant then robbed Patricia Lee of money. Lee pulled out a gun and fired at defendant. Dortch stated that everyone started running and "going crazy trying to get to the stairs," and the defendant shot back at Lee. Dortch and some others ran upstairs, waited a minute for the shooting to stop, and then returned to find a man on the floor in a pool of blood. Dortch described chasing the defendant down the street with others, stopping when defendant turned and pointed his gun at them.

Lee testified she was charged with two gun-related offenses that occurred at the same time and place that Moseley was killed. She acknowledged being granted immunity by the State in return for her testimony. According to Lee, she was in the hallway waiting for a "drug pick-up." She believed it was Dortch who went upstairs to get the drugs. She claimed defendant fired a warning shot into the air to hurry the person in returning with the drugs. Another man briefly entered the hallway, but exited quickly after defendant pointed a gun at him. Defendant then began searching the individuals in the hallway and allegedly took Lee's jewelry and black trench coat, which contained money. Lee testified that the individual ordered to get the stash did not comply with defendant's demand, and that defendant was on his way out when she pulled a .38 caliber handgun and fired once at

the defendant. Defendant returned her fire with two gun shots. Lee admitted she had originally believed that she might have shot Moseley. She claimed a friend of the one of the individuals in the hallway had subsequently taken her weapon.

The police recovered two shell casings, one in the hallway and the other near the victim's body. A ballistics expert testified that the shells recovered that day were nine millimeter shells. He further testified that, in his opinion, they were fired from the nine millimeter gun in evidence that was recovered from defendant on November 5, 1993. An autopsy revealed gunshot wounds on the back of the chest and back of the right leg as the cause of victim's death. No traces of gunpowder were found on the wounds, suggesting that the victim was not shot at close range.

Mike Davis testified for the defense that, shortly before the shooting, Lee and the defendant were arguing about a purchase of bad drugs. He testified that Lee pulled a handgun, and that defendant and Lee were "tussling" when the gun went off. He heard two or three shots.

Keith Barnhill testified for defendant that he overheard Lee speaking with someone afterwards and that she described a struggle with defendant and that she had pulled a gun. He testified that he heard her say the gun went off and that she thought she might have shot Moseley.

Defendant testified he was on his way to speak to his Aunt about a job when he came across Murphy who convinced him to purchase cocaine. He said that he found the cocaine was no good and was seeking a refund. He entered the building and began a discussion with Lee who told him to "get the F out of here" as she pulled a weapon. Defendant asserted that, fearing he would be shot, he rushed Lee and struggled with her and grabbed her wrist. He stated someone else grabbed him and they started falling, along the wall to the ground during which time her gun went off. Defendant alleged that the gun fell to the floor and he feigned being shot. He then heard Lee exclaim she thought she shot "him," which defendant claimed referred to Moseley. Defen-

dant then heard Lee start to go for the gun, at which point he opened his eyes, grabbed it himself, and ran out the door. According to defendant, he fled to his sister's house with the gun. He admitted having the gun on his person the next day when he was tackled by Detective Moraes.

In Point One, defendant argues that he was subjected to an unreasonable seizure when Detective Moraes tackled him and took his gun, and that all evidence that resulted from this seizure should have been suppressed at trial as "fruit of the poisonous tree." We find this contention to be so lacking in merit as to not require extended discussion. *R.* 2:11–3(e)(2); *see State v. Davis,* 104 *N.J.* 490, 498–99, 517 *A.*2d 859 (1986).

Investigatory detentions have been held constitutional so long as the stop is supported by a reasonable suspicion that criminal activity is afoot. *See Terry v. Ohio,* 392 *U.S.* 1, 88 *S.Ct.* 1868, 20 *L.Ed.*2d 889 (1968); *State v. Arthur,* 149 *N.J.* 1, 691 *A.*2d 808 (1997). Our New Jersey Supreme Court, in *State v. Davis,* discussed the rationale behind *Terry* and the United States Supreme Court's endorsement of investigative detentions effectuated without probable cause.

> [The *Terry* Court] recognized that effective crime prevention and detection is the general underlying governmental interest that permits a police officer in appropriate circumstances and in an appropriate manner, but without probable cause, to intrude upon the constitutionally protected interests of a private citizen to investigate possible criminal behavior. This general governmental interest is sufficient to justify a particular intrusion, however, only when the police officer can "point to specific and articulable facts, which *taken together with rational inferences from those facts,* reasonably warrant that intrusion."
>
> [*Davis, supra,* 104 *N.J.* at 499–500, 517 *A.*2d 859 (quoting *Terry, supra,* 392 *U.S.* at 21, 88 *S.Ct.* at 1880, 20 *L.Ed.*2d at 906).]

A reviewing court must analyze the totality of the circumstances, balancing the State's interest against the citizen's constitutional rights. *Id.* at 504, 517 *A.*2d 859. "An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *United States v. Cortez,* 449 *U.S.* 411, 417, 101 *S.Ct.* 690, 695, 66 *L.Ed.*2d 621, 628 (1981) (footnote omitted). "[A]n anonymous call may

provide the factual predicate necessary to justify an investigatory stop when there is corroboration of the information furnished." *State v. Zapata,* 297 *N.J.Super.* 160, 173, 687 *A.*2d 1025 (App.Div. 1997); *see also State v. Thomas,* 110 *N.J.* 673, 683, 542 *A.*2d 912 (1988); *State In Re H.B.,* 75 *N.J.* 243, 249, 381 *A.*2d 759 (1977) ("The 'informer reliability' demanded by *Spinelli v. United States* [citation omitted] and *Aguilar v. Texas* [citation omitted] is not a prerequisite.").

Further, the authority to conduct an investigative stop must necessarily carry with it some ability to effectuate such a stop, including the use of force, if necessary. *See Kolender v. Lawson,* 461 *U.S.* 352, 366, 103 *S.Ct.* 1855, 1863, 75 *L.Ed.*2d 903, 915 (1983) (Brennan, J. concurring) ("[U]nder the Fourth Amendment, police officers with reasonable suspicion that an individual has committed or is about to commit a crime may detain that individual, using some force if necessary, for the purpose of asking investigative questions"); *State v. Doss,* 254 *N.J.Super.* 122, 127–28, 603 *A.*2d 102 (App.Div.) (police officers with reasonable suspicion "were legally entitled to order defendant to halt, and they were entitled to use non-lethal force to compel compliance with their command"), *certif. denied,* 130 *N.J.* 17, 611 *A.*2d 655 (1992); *cf. State v. Tucker,* 136 *N.J.* 158, 642 *A.*2d 401 (1994). Here, the seizure was clearly lawful.

█ The argument raised by defendant in Point Two, that the indictment failed to provide sufficient notice concerning the resisting arrest charge in Count Ten, was not raised at any time in the Law Division, therefore, we need not consider it pursuant to *R.* 3:10–2(c). Moreover, defendant's contention in this regard is without merit. *R.* 2:11–3(e)(2). *See State v. Spano,* 128 *N.J.Super.* 90, 92, 319 *A.*2d 230 (App.Div.1973) (lack of precision in indictment claim made too late on appeal), *aff'd,* 64 *N.J.* 566, 319 *A.*2d 217 (1974); *State v. M.L.,* 253 *N.J.Super.* 13, 19, 600 *A.*2d 1211 (App.Div.1991) (noting that sufficiency of indictment had been met and that, regardless, insufficiency claim was barred on appeal).

■ As to Point Three, the trial court raised, on its own initiative, the issue of whether the State satisfied its burden on Count Ten.

> The Court: Except the Court raises the issue on the 10th count [Prosecutor]. What testimony do we have that Richard Cuccolo was prevented from making an arrest?
>
> [Prosecutor]: Judge, I believe, if you read the 10th count, it indicates Detective Cuccolo and other members of the Newark Police Department. The testimony from Detective Moraes was in fact that he, Detective Cuccolo and Detective Childress were there, that in fact he had engaged in a struggle and that Detective Cuccolo came in during the course of the struggle. Detective Childress assisted in the arrest and Detective Cuccolo recovered the weapon.
>
> The Court: That's true, but the only testimony that we heard was that it was Moraes who was involved in being able to affect the arrest.
>
> [Prosecutor]: That's correct, Judge, but, as I indicated, the reading of the Indictment on Count ten is that did [sic] purposely prevent Richard Cuccolo, a police officer of the City of Newark and other members of the Newark Police Department. I would submit that Detective Moraes clearly is another member of the Newark Police Department and as such that count should stand.
>
> The Court: I'm going to allow it, but, as I say, it's a question of whether or not a jury will find those facts.

*N.J.S.A.* 2C:29-2 provides in pertinent part as follows:

> a. A person is guilty of a disorderly persons offense if he purposely prevents a law enforcement officer from effecting a lawful arrest, except that he is guilty of a crime of the fourth degree if he;
>
> 1. Uses or threatens to use physical force or violence against the law enforcement officer or another;

Defendant argues that because Officer Cuccolo is listed in the indictment he can not be found guilty of resisting arrest as to Detective Moraes. As noted at trial, this contention is without merit.

Defendant next urges that Moraes's credibility was weak, and that defendant did not resist. Defendant contends that Moraes was in plainclothes, did not announce his intention to arrest, used excessive force, and also that the defendant's resistance was "self-defense."

In making the determination of whether there was sufficient evidence for a jury to convict, it is essential to remember that it is the jury's role to evaluate a witness's credibility and not the

court's. *State v. Ingenito*, 87 *N.J.* 204, 211, 432 *A.*2d 912 (1981). Here, the jurors obviously found Detective Moraes credible. The jury was entitled to conclude from the testimony that 1) Moraes identified himself as a police officer and told the defendant to stop, 2) that the defendant heard this identification and proceeded to run, and 3) that the defendant was subsequently tackled and being placed under arrest when the defendant again resisted by getting to his feet and pulling a gun on the detective. These facts are sufficient to convict under the statute.

Defendant also argues that because Detective Moraes failed to utter the words "You're under arrest," defendant did not, in fact, resist an arrest. *N.J.S.A.* 2C:29–2a uses the language "purposely prevents ... a lawful arrest." Thus, resisting arrest requires a culpability of purpose. *See State v. Murphy*, 185 *N.J.Super.* 72, 447 *A.*2d 219 (Law Div.1982). A jury here could determine that the defendant knew that the police were attempting to effectuate an arrest and resisted the arrest. The failure to announce that defendant was under arrest would only be one factor to be considered in the overall sequence of events leading to the arrest.

In Point Four, defendant raises for the first time a number of objections to the trial court's instructions to the jury. *R.* 2:10–2 provides that plain error may be noticed on appeal, in the interests of justice, even if not brought to the attention of the trial court. Our Supreme Court has stated that "clear and correct jury instructions are essential for a fair trial." *State v. Brown*, 138 *N.J.* 481, 522, 651 *A.*2d 19 (1994). Plain error in these circumstances requires "legal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result." *State v. Hock*, 54 *N.J.* 526, 538, 257 *A.*2d 699 (1969).

"[P]ortions of a charge alleged to be erroneous cannot be dealt with in isolation but the charge should be examined as a whole to

determine its overall effect." *State v. Wilbely*, 63 *N.J.* 420, 422, 307 *A.*2d 608 (1973) (citing *State v. Council*, 49 *N.J.* 341, 342, 230 *A.*2d 383 (1967); *State v. Hale*, 45 *N.J.* 255, 263–65, 212 *A.*2d 146 (1965)). The charge may be satisfactory where the "the trial judge succeeded in communicating the law to the jury, although admittedly not with the neat precision with which it might have been accomplished." *State v. Freeman*, 64 *N.J.* 66, 69, 312 *A.*2d 143 (1973).

■ Defendant first argues that the instructions did not inform the jury of the distinction between aggravated manslaughter and reckless manslaughter. *N.J.S.A.* 2C:11–4 defines Manslaughter. Subsection a. provides "Criminal homicide constitutes aggravated manslaughter when the actor recklessly causes death under circumstances manifesting extreme indifference to human life." Subsection b. provides "Criminal homicide constitutes manslaughter when: (1) It is committed recklessly; . . . ."

The difference between the two types of manslaughter is in the degree of the risk that death will result from defendant's conduct.

> This difference in degree is to be established by the second element in aggravated manslaughter which is not required in a reckless manslaughter case. We envision that the Legislature intended that the degree of risk in reckless manslaughter be a mere possibility of death. In aggravated manslaughter, however, the additional element that death be caused "under circumstances manifesting extreme indifference to human life" elevates the risk level from a mere possibility to a probability.
>
> . . . The ultimate question for the factfinder is whether the homicide was committed under circumstances involving a mere possibility of death or did the circumstances involve a probability of death.
>
> [*State v. Curtis*, 195 *N.J.Super.* 354, 364–65, 479 *A.*2d 425 (App.Div.), *certif. denied*, 99 *N.J.* 212, 491 *A.*2d 708 (1984); *see also State v. Breakiron*, 108 *N.J.* 591, 605, 532 *A.*2d 199 (1987) (citing the probability verse possibility language of *Curtis* with apparent approval).]

Our review of the charge given to the jury regarding aggravated and reckless manslaughter satisfies us that the charge was adequate. The trial judge successfully differentiated between aggravated and reckless manslaughter in his original charge to the jury, except for the following last two lines of the charge, which may merely be a faulty transcription:

> In other words, the degree between an aggravated manslaughter and reckless manslaughter is that under aggravated manslaughter he must have—in that he caused the death under circumstances manifesting extreme indifference to human life. That was separated from simply reckless manslaughter.

In any event, the charge must be considered in its entirety.

Moreover, the judge responded to jury questions, one of which requested the definition of the two types of manslaughter, as follows:

> I've said in considering this particular count then you have the right to discuss what we call lesser included offenses of that charge and a lesser included offense is what we would call aggravated manslaughter and another lesser charge is reckless manslaughter. Distinction being that an aggravated manslaughter the state has to find, the state has to prove that Mr. Branch caused the death of Mr. Mosely, that he did so recklessly, but also that he did so under circumstances manifesting extreme indifference to human life. That's a distinction between simply reckless and aggravated manslaughter and what we mean by under circumstances manifesting extreme indifference to human life is the phrase, is that the phrase life does not focus on Mr. Branch's state of mind, but, rather, under the circumstances under which you find he acted. If in light of all the evidence you find that his conduct resulted in a probability as opposed to a mere possibility of death, then you may find that he acted under circumstances manifesting extreme indifference to human life. Reckless manslaughter, it would be if a person acted reckless, simply under circumstances—the definition would be a person who causes another's death does so recklessly when he's aware of and consciously disregards a substantial and unjustifiable risk that death will result from his conduct. The risk must be of such a nature and degree that considering the nature and the purpose of a defendant's conduct and the circumstances known to him his disregard of that risk is a gross deviation from the standard of conduct that a reasonable person would follow in the same situation.

The charge, while somewhat disjointed, is not erroneous. The elements of the two manslaughters were appropriately charged.

Defendant's assertion of reversible error because the judge failed to mold the facts into the jury instructions is not persuasive. *See State v. Concepcion,* 111 *N.J.* 373, 380–81, 545 *A.*2d 119 (1988). The judge did mold the charge to the case to a limited degree, and the distinction was made clear enough between aggravated and reckless manslaughter to be understood and applied by the jury.

■ Defendant contends that the self-defense jury instruction was deficient in a number of ways. Defendant points out that the trial judge failed to instruct the jury that, once the issue of self-

defense had been raised at the trial, the State was required to prove beyond a reasonable doubt that the self-defense claim does not accord with the facts. *See State v. Kelly,* 97 *N.J.* 178, 200, 478 *A.*2d 364 (1984). In *Kelly,* it is stated that "if any evidence raising the issue of self-defense is adduced ... then the jury must be instructed that the State is required to prove beyond a reasonable doubt that the self-defense claim does not accord with the facts." *Ibid.* at 200, 478 *A.*2d 364; *see also* Model Jury Charges–Criminal, 2C:3–4 at 5–6 (1988).

The State posits that there was only slight evidence that could have given rise to a self-defense charge, and that in fact the charge should not have been given at all. It certainly is open to question whether the charge on self-defense was warranted where the defendant was attempting to rob Lee and the others and used a gun to threaten them. The defendant's defense was that he never possessed a gun or shot one, but only wrestled with Lee who fired hers. We need not in these circumstances decide whether self-defense was appropriately made the subject of a charge to the jury, as we find no chance that the instructions lead to an unjust result. *See State v. Heslop,* 135 *N.J.* 318, 322, 639 *A.*2d 1100 (1994) (allowing errors made in charging passion/provocation manslaughter to stand). Significantly, viewed in its entirety, the charge conveyed that the State always has the burden of proof. The trial court's omission was not plain error. *R.* 2:10–2.

■ Defendant argues that the trial judge inadequately responded to questions from the jury. This issue was partially raised at trial, when a number of questions were put to the judge by the jury. The first round of questions included: 1) what is the definition of felony murder, 2) what is the definition of the three charges that relate to murder, aggravated manslaughter, and reckless manslaughter, 3) did they find the bullets strike anywhere, 4) what is the difference between a gun and a semi-automatic for Counts Seven, Eight, and Nine, 5) what are the charges against Patricia Lee regarding this case, 6) "ask concern

over Patricia Lee's claim weapon, whether information can be provided over Patricia Lee."

The jury thereafter asked more questions, which the court reviewed with the jury, as follows:

[The Court]: I want to go over them and make sure I know what you want. First one is *what is the legal definition of armed robbery* which, of course, I shall give. *If nothing is taken is it still armed robbery if a gun is held to someone.* Is that what you're asking? Then *to convict of felony murder must he be*—I can't read that.

[Jury]: What was that?

[The Court]: *Must he be charged guilty of one or the other, felony charges on the list. Example, if Pettie (Lee) was robbed is it felony murder.* Well, he's not being charged with the robbery of Pettie (Lee), I can answer that. *Why are certain individuals singled out robbery charge and not a general robbery. Why weren't all individuals listed separately.* I'll answer that on Monday morning.

The jury apparently sought to clarify whether felony murder required a finding of guilt on a predicate felony from among those offenses listed in the indictment. The jury specifically asked whether, if they believed that Lee was robbed, they could convict for felony murder despite the fact that the defendant had not been charged with or indicted on the robbery of Lee. Notably, this question provides background for the jury's finding of guilty on felony murder despite its finding of not-guilty in regards to the armed robbery charges set forth in the indictment.

The judge's response to the hypothetical posed by the jury, was: "Well, he's not being charged with the robbery of Pettie (Lee), I can answer that." This answer was non-responsive. The jury's question requested an explanation of whether an unindicted offense can be used as the predicate felony for felony murder.

The judge returned to the questions on Monday. He first provided the definition of armed robbery, and then continued

[The Court]: Now, as to the other two questions, I'm going to ask you to read them to me so I know exactly what it is that the jury wants.

 Can you read that for us.

[The Juror]: Yeah.

[The Court]: That's the second one.

[The Juror]: To be convicted of a felony murder must he be charged or guilty of one of the other felony charges on the list.

[The Court]: To constitute felony murder, if a murder takes place during the commission of any crime it becomes felony murder. That's what distinguishes that particular one.

I hope I've explained that to you.

What's the third? You want time to prepare those other questions for me.

[The Juror]: Yeah.

Again, the judge missed the point of the question and did not respond to whether the predicate felony for felony murder must come from one of the offenses for which defendant has been indicted.

The judge then sent the jury back to rephrase the third question, which concerned why the defendant was indicted for robbing only certain individuals and not others, and why the charges were separate and not consolidated. The jury was obviously curious as to why the defendant had not been indicted for robbing Lee. Instead of rephrasing the question, however, the jury apparently determined to continue deliberations and return its verdict. We are satisfied that the jury adequately understood the issues presented and appropriately carried out its duty. We discuss later the answer to the jury's legal question.

■ Defendant further argues that the court committed plain error by not instructing the jury on passion/provocation manslaughter, *N.J.S.A.* 2C:11–4(b)(2), and assault, *N.J.S.A.* 2C:12–1(a)(2).

Here, there was no request by defense counsel to charge passion/provocation or assault.

The trial court does not, by virtue of *[State v.] Powell,* [84 *N.J.* 305, 419 *A.2d* 406 (1980)] have the obligation on its own meticulously to sift through the entire record in every murder trial to see if some combination of facts and inferences might rationally sustain a manslaughter charge. It is only when the facts "clearly indicate" the appropriateness of that charge that the duty of the trial court arises.

[*State v. Choice,* 98 *N.J.* 295, 299, 486 *A.2d* 833 (1985).]

The disputed facts of the case did not "clearly indicate" that such charges were appropriate. *See ibid.* The defendant had argued 1) that he never possessed any gun until he wrestled with Lee, 2) that Lee fired the shots while he struggled with her and while he

had his hand around her wrist, and 3) that he only picked up the gun from the ground after playing dead. There was no plain error. Additional instructions on the court's own volition would have focused the jury's attention away from defendant's version. *See State v. Perry*, 124 *N.J.* 128, 162, 590 *A.*2d 624 (1991) ("Trial courts must carefully refrain from preempting defense counsel's strategic and tactical decisions and possibly prejudicing defendant's chance of acquittal.").

The defendant next contends that the jury's verdict was against the weight of the evidence on Counts Three, Six, Seven, Eight, Nine, Ten, Fourteen, and Fifteen. Defendant's motion to set aside the verdicts on these counts was denied, but was granted as to Count Two, felony murder.

The trial court's denial of defendant's motions will not be reversed "unless it clearly appears that there was a miscarriage of justice under the law." *R.* 2:10–1; *State v. Sims,* 65 *N.J.* 359, 373–74, 322 *A.*2d 809 (1974). The convictions as to the remaining counts were not against the weight of the evidence. Defendant's attacks on Count Three (aggravated manslaughter) and Count Six (pointing a firearm at Ratchford) are solely based on the defendant's contention that the State's witnesses were incredible. Assessing witness credibility is the function of the jury rather than the court. *See Ingenito, supra,* 87 *N.J.* at 211, 432 *A.*2d 912. The State provided ample evidence of defendant's guilt on these counts. Defendant's claims that he should not have been convicted for possessing a gun on November 4 and 5, 1993 (Counts Seven and Eight), and for possessing hollow points on those dates (Counts Nine and Fifteen), are also without substance. There was considerable evidence from which the jury could infer that the defendant possessed the gun on those days knowing that it was loaded with hollow point bullets.

Defendant's contention that the admission of three autopsy photographs of the decedent, over objection, deprived him of a fair trial is rejected. "[A]dmissibility of photographs of the victim of a crime rests in the discretion of the trial court, and the

exercise of its discretion will not be reversed in the absence of a palpable abuse thereof." *State v. Thompson,* 59 *N.J.* 396, 420, 283 *A.*2d 513 (1971) (citing *State v. Conklin,* 54 *N.J.* 540, 545, 258 *A.*2d 1 (1969); *State v. Gosser,* 50 *N.J.* 438, 448, 236 *A.*2d 377 (1967), *cert. den.,* 390 *U.S.* 1035, 88 *S.Ct.* 1434, 20 *L.Ed.*2d 295 (1968)) (other citations omitted). In other words, on review, the trial court's decision must stand unless "it's finding was so wide of the mark that a manifest denial of justice resulted." *State v. Carter,* 91 *N.J.* 86, 106, 449 *A.*2d 1280 (1982). Here, there is no reason to suppose that the photographs had an adverse affect on the jury.

There is also no reason to conclude that the omission of self-defense from the verdict sheet constitutes plain error. The verdict sheet merely represents the possible verdicts the jury could reach. *See R.* 1:8–8. There is no verdict *per se* of "self-defense." Rule 1:8–8 makes clear that the decision to include self-defense would be at the discretion of the trial judge. We find no abuse of discretion. *State v. Reed,* 249 *N.J.Super.* 41, 50–51, 592 *A.*2d 4 (App.Div.1991), *aff'd in part, rev'd in part not relevant here,* 133 *N.J.* 237, 627 *A.*2d 630 (1993) holds only that the verdict sheet should have given the jury the opportunity to return a verdict with respect to passion-provocation manslaughter, which had been erroneously omitted in that case. Thus, *Reed* only requires reversal when an alternative verdict has been omitted, not a defense.

The State cross-appeals seeking to have the defendant's conviction under Count Two, felony murder, reinstated. The judge set aside the conviction on Count Two based on the failure of the jury to convict on the indicted offenses of armed robbery—a prerequisite, the judge believed, for a felony murder conviction. The dismissal does not indicate in any way a conclusion that insufficient evidence existed to convict defendant of felony murder, and it is apparent that the judge did not consider that issue. The dismissal was based purely on the judge's interpretation of the law in regards to inconsistent verdicts and is thus appealable.

Regarding the issue of inconsistent verdicts, this State follows the *Dunn/Powell* rule that "consistency of verdicts is not required under our law." *State v. Ortiz,* 253 *N.J.Super.* 239, 244–45, 601 *A.2d* 735 (App.Div.), *certif. denied,* 130 *N.J.* 6, 611 *A.2d* 646 (1992) (citing *United States v. Powell,* 469 *U.S.* 57, 62–66, 105 *S.Ct.* 471, 476–78, 83 *L.Ed.2d* 461, 467–69 (1984)); *Dunn v. United States,* 284 *U.S.* 390, 393–94, 52 *S.Ct.* 189, 190–91, 76 *L.Ed.* 356, 358–59 (1932); *State v. Crisantos (Arriagas),* 102 *N.J.* 265, 272, 508 *A.2d* 167 (1986); *State v. Ingenito,* 87 *N.J.* 204, 211–12, 432 *A.2d* 912 (1981) (other citations omitted). "Any inquiry in this regard is limited to whether the counts of which defendant was convicted were supported by sufficient evidence to permit a rational fact finder to find guilt beyond a reasonable doubt." *Id.* at 245, 601 *A.2d* 735 (citations omitted).

That *Dunn/Powell* applies in New Jersey was recently confirmed by our Supreme Court in *State v. Grey,* 147 *N.J.* 4, 11, 685 *A.2d* 923 (1996). In *Grey,* a jury had convicted defendant of felony murder and second-degree conspiracy to commit aggravated arson, but acquitted him, among other things, of second-degree aggravated arson. *Id.* at 14, 685 *A.2d* 923. However, as the substantive crime of conspiracy is not a predicate offense for felony murder under *N.J.S.A.* 2C:11–3a(3), the Court was convinced that the jury misunderstood that felony murder required the jurors to first find that defendant had "'engaged in the commission of aggravated arson,'" and "undoubtedly relied upon an improper predicate felony, and thus did not properly convict defendant." *Id.* at 15–16, 685 *A.2d* 923.

Here, the pivotal issue is whether the predicate felony for a felony murder conviction must stem from an indictment charging the defendant with the predicate felony as a separate charge. That is, can a defendant be found guilty of felony murder where the jury finds defendant guilty of a homicide committed during the course of a statutorily enumerated felony, here the robbery of Lee, but where the defendant was not charged separately with that felony.

The jury inquired: *"Must he be charged guilty of one or the other felony charges on the list. Example, if Pettie (Lee) was robbed is it felony murder."* It is obvious from the jury's question that the jury convicted defendant of felony murder based on its finding that the defendant robbed Lee—a person who defendant was not charged in an indictment with robbing. Therefore, if the robbery of Lee cannot stand as a basis for the predicate felony, then the felony murder conviction must fall as it would be the result of a mistake of law, not lenity. *Id.* at 16, 685 *A.*2d 923.

The jury was properly charged with the elements of both armed robbery and felony murder. It was, therefore, well equipped to find that the armed robbery of Lee occurred, even if no indictment existed charging defendant with robbery of her. Here, unlike in *Grey,* the predicate felony, the armed robbery of Lee, was an enumerated felony, resulting in a proper conviction for felony murder. The only practical effect of the court's lack of response to the jury's question was to fail to clarify a point of law that had never been considered by our New Jersey courts. We now answer the question, and also find that the failure of the trial judge to answer that question for the jury was not prejudicial to defendant.

A defendant need not be separately indicted or convicted of the predicate felony murder count. Rule 3:7–3 describes the nature and prescribes the requisite contents of the indictments as follows:

(a) Nature and Contents Generally. The indictment or accusation shall be a written statement of the essential facts constituting the crime charged, need not contain a formal commencement and shall be signed by the prosecuting attorney.... Allegations made in one count of the indictment or accusation may be incorporated by reference in another count....

(b) Indictment for Murder or Manslaughter. Every indictment for murder shall specify whether the act is murder as defined by N.J.S.A. 2C:11–3(a)(1), (2) or (3)....

"The test of the adequacy of an indictment is whether the document in reasonably understandable language communicates to the defendant the essential factual ingredients of the offense." *State v. Boratto,* 80 *N.J.* 506, 518, 404 *A.*2d 604 (1979); *State v.*

*Silverstein,* 41 *N.J.* 203, 207, 195 *A.*2d 617 (1963); *State v. Low,* 18 *N.J.* 179, 185, 113 *A.*2d 169 (1955).

A homicide constitutes felony murder when

[i]t is committed when the actor, acting either alone or with one or more other persons, is engaged in the commission of, or an attempt to commit, or flight after committing or attempting to commit robbery, sexual assault, arson, burglary, kidnapping or criminal escape, and in the course of such crime or of immediate flight therefrom, any person causes the death of a person other than one of the participant[s].

[*N.J.S.A.* 2C:11–3a(3).]

Here, the grand jury received testimony that the individuals in the hallway, including Lee, were all held at gunpoint, frisked, and asked for their drugs. Murphy testified that defendant told the individuals in the hall, including Lee, to get against the wall and asked them for their stash. Dortch also testified that Lee was in the hall and that defendant made her get up against the wall and checked her for money and drugs. Although the State didn't request from the grand jury an independent charge against defendant for robbing or attempting to rob Lee, it is evident that testimony as to the robbery of Lee was submitted for the grand jury's consideration and substantively formed part of the basis for indicting defendant for felony murder. The evidence before the grand jury was clearly capable of supporting an indictment against the defendant for felony murder grounded upon an armed robbery of Murphy, Dortch, Lee, or Moseley.

The grand jury, in fact, charged defendant with felony murder: a homicide committed during the course of an enumerated felony. That the indictment makes the specific reference to the armed robbery of Moseley is not on these facts fatal to a finding that the predicate felony was the robbery of Lee, as felony murder can be based on a homicide committed during the course of *any* enumerated felony. *See also State v. Dixon,* 125 *N.J.* 223, 256–58, 593 *A.*2d 266 (1991) (no error where defendant indicted for aggravated sexual contact based on the commission of a robbery and the court charged the jury with aggravated criminal sexual contact based on either robbery or the fact that defendant was armed); *State v.*

*Talley,* 94 *N.J.* 385, 393, 466 *A.*2d 78 (1983) (allowing court to charge theft by deception where defendant was indicted for robbery even though former charge is not a lesser included offense of robbery).

Pennsylvania has "repeatedly held that where murder is alleged to have been committed in the perpetration of a felony, perpetration of that felony need not be set forth in the indictment." *Commonwealth v. Hainds,* 448 *Pa.* 67, 292 *A.*2d 337 (1972); *see also Commonwealth v. Fostar,* 455 *Pa.* 216, 317 *A.*2d 188 (1974) (when indictment charges murder and burglary Commonwealth not precluded from proving first degree murder based upon some other felony). Other jurisdictions have held similarly. *See United States v. Greene,* 834 *F.*2d 1067, 1071–72 (D.C.Cir.1987) (stating that, under District of Columbia law, there is no requirement to indict or convict a defendant on an underlying felony in order to secure a conviction for felony murder); *State v. Wise,* 237 *Kan.* 117, 122–23, 697 *P.*2d 1295, 1299–1300 (1985) (holding that an accused need not be prosecuted or convicted of the underlying felony in order to be convicted of felony murder); *State v. Wroblewski,* 109 *A.D.*2d 39, 44, 489 *N.Y.S.*2d 797, 802 (1985) (stating that it is settled that a felony murder conviction may stand even if the underlying felony which serves as its predicate was not submitted to the jury, or had been dismissed, or had not been charged under separate indictment).

We are satisfied that the indictment would have been sufficient under *R.* 3:7–3 if it had merely named the predicate felony as a robbery without specifically referring to the person or persons who were robbed. The killing of Moseley was so closely intertwined with the events that constituted the robbery defendant was in the course of perpetrating that defendant could not have been surprised or prejudiced in his defense of the felony murder charge. Defense counsel did not object to the testimony concerning the robbery of Lee as it was clear the State was going to offer evidence that defendant had robbed a number of people in the hallway. Notice to defendant that he was charged with killing

Moseley during the commission of a robbery was sufficient. *See State v. Smith, D.,* 279 *N.J.Super.* 131, 148, 652 *A.*2d 241 (App.Div. 1995); *State v. Smith, H.,* 210 *N.J.Super.* 43, 59, 509 *A.*2d 206 (App.Div.), *certif. denied,* 105 *N.J.* 582, 523 *A.*2d 210 (1986). We, therefore, conclude that the jury verdict of guilty on the felony murder count was proper and should not have been set aside. We order reinstatement of defendant's conviction on Count Two.

The defendant also appeals his sentence, arguing that the judge did not apply the sentencing guidelines and that his sentence is excessive and shocks the judicial conscience. The State concedes that defendant should be resentenced due to the failure of the judge to provide reasons for his sentencing decisions. In any event, resentencing is required because of our reinstatement of the felony murder conviction on Count Two.

 We note that, particularly as to a trial court's decision to impose consecutive sentences, reasons are a prerequisite for adequate appellate review. *See State v. Miller,* 108 *N.J.* 112, 122, 527 *A.*2d 1362 (1987). A sentencing court is required to expressly set forth on the record its reasons for a consecutive sentence and failure to do so compels a remand for resentencing. *Ibid.; see also State v. Yarbough,* 100 *N.J.* 627, 643, 498 *A.*2d 1239 (1985) ("the reasons for imposing either a consecutive or concurrent sentence should be separately stated in the sentencing decision"), *cert. denied,* 475 *U.S.* 1014, 106 *S.Ct.* 1193, 89 *L.Ed.*2d 308 (1986).

 The trial judge failed to state any reasons for his decision to run Counts Six, Seven, Nine, and Ten consecutively. We remand for resentencing of defendant. Upon resentencing, the court should determine whether a hearing is required under *N.J.S.A.* 2C:43–6(d) to determine if the defendant was a second-offender under the Graves Act.

The issues and contentions raised by defendant in his *pro se* brief are without sufficient merit to warrant discussion in this opinion. *R.* 2:11–3(e)(2).

We affirm defendant's convictions and reinstate his conviction for felony murder. We remand for resentencing and amendment of the Judgment of Conviction.