696 A.2d 108

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
WILLIAM J. KANE, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued April 21, 1997—Decided July 16, 1997.

Before Judges HAVEY, BROCHIN and EICHEN.

*Bennet D. Zurofsky* argued the cause for appellant (*Reitman Parsonnet*, attorneys; *Mr. Zurofsky* and *William J. Volonte*, on the brief).

*Francis X. Hermes*, Special Prosecutor, argued the cause for respondent (*Millet & Hermes*, attorneys; *Mr. Hermes*, on the brief).

*Frank L. Corrado* argued the cause for amicus curiae American Civil Liberties Union of New Jersey (*Rossi, Barry, Corrado, Grassi & Radell*, attorneys; *Mr. Corrado*, on the brief).

The opinion of the court was delivered by

BROCHIN, J.A.D.

Defendant William J. Kane was tried and convicted in the Manville Municipal Court for disrupting a public meeting (*N.J.S.A.* 2C:33–8) and resisting arrest (*N.J.S.A.* 2C:29–2). He was fined $250 for the violation of *N.J.S.A.* 2C:33–8 and $750 for violation of *N.J.S.A.* 2C:29–2, both disorderly persons offenses. For the latter violation, he was also sentenced to serve one day in the county jail and to complete ten days of community service. The jail sentence was suspended. Appropriate costs, fees and assessments were also imposed. After an appeal *de novo* to the Law Division, defendant's convictions were affirmed. The same punishments were imposed, except that the one-day suspended jail sentence was deleted.

The meeting which defendant was convicted of disturbing was an official hearing before the Committee on the Budget of the United States House of Representatives. Representative John Kasich, a congressman from Ohio who was chairman of the committee, presided. The meeting took place in a Veterans of Foreign Wars building in Manville, New Jersey. Spectators and participants filled the meeting space to capacity. The audience is said to have numbered a thousand persons.

Some of the speakers who were permitted to address the committee had been selected in advance of the meeting. Some were selected from the floor by committee staff. Defendant was the New Jersey Area Director of the United Auto Workers union and president of the New Jersey Industrial Union Council. Both before and during the hearing, he attempted to be recognized as a speaker. He was unsuccessful. He then tried to gain Representative Kasich's attention by addressing him in a loud voice from the floor. As a result, four or five policemen who were in

attendance to maintain order seized him, carried him out, hand-cuffed him, and took him to police headquarters where he was charged.

The State presented its case through the testimony of four police officers. The first was Patrolman Darrin DeGraw. He was the first of the arresting officers to reach defendant after the first shout of "Mr. Chairman!" He testified that he "approached the subject along with Detective [Mark] Sniscak and asked him to please be quiet and be seated." According to DeGraw, defendant ignored him and continued shouting, "Point of order. May I get a chance to speak?" Defendant "continued yelling." The two po-licemen "advised [defendant] to be seated and he would be able to remain." Because he continued yelling, they told him he had to leave. He refused to leave and continued yelling. DeGraw testi-fied Detective Sniscak "advised [defendant] he was under arrest" and, as they attempted to remove him, defendant "pulled back." Defendant continued to yell and would not be seated. Finally, DeGraw testified, when defendant refused to accompany them out of the hall, they grabbed his arm and, with the help of a third policeman, carried him out "flailing, kicking, struggling, yelling." In the parking lot outside the building, they put him over the back of a car, handcuffed him while he continued to struggle, frisked him and put him into a patrol car.

Three other police officers provided similar testimony. Detec-tive Mark Sniscak generally corroborated Patrolman DeGraw's testimony, except that Sniscak testified to substantially longer time intervals between his hearing defendant's first shout of "Mr. Chairman!," his ordering defendant to sit down and be quiet, and his carrying defendant out of the hall. Patrolman John Granihan testified that he was dispatched to the Veterans of Foreign Wars building with his patrol car and that he drove defendant to the police station after his arrest. Patrolman Granihan did not ob-serve any of the relevant events inside the building, but he corroborated the other officers' testimony that defendant resisted being handcuffed in the parking lot. Detective Michael Gilbert,

who testified as a rebuttal witness, added that defendant had tried to kick him in the face while being carried out of the hall.

Defendant's own description of his attempts to attract the chairman's attention were not materially different from those provided by the State's witnesses. Defendant denied, however, that any policeman had said anything to him before removing him from the building. He also denied resisting the police, flailing or pulling his limbs away from them in any way except, possibly, pulling a policeman's hand away from his windpipe. He testified that he had not had any conversation with the police inside the hall, and that he had not been told that he was under arrest until he was being handcuffed in the parking lot outside.

Besides testifying himself, defendant presented the testimony of ten other witnesses. Their testimony was generally consistent with his. All but two of them were associated with defendant through their positions in a labor union or through some kind of labor union activity. One of the two who was not acquainted with defendant was the mother of one of defendant's associates. The other witness who was unacquainted with defendant was a retired editor of the New York *Daily News.* After observing defendant's arrest, he had approached defendant's attorney and offered to be a witness. He testified that after defendant had called out "Mr. Chairman" in a loud voice, "in nothing flat, policemen were there, grabbing the guy and hauling him out like he was a piece of lumber and it just appeared to me that it was a set up." This witness was not close enough to defendant to hear what, if anything, was said before he was taken out of the hall.

The municipal court judge found that defendant had been shouting loudly while a witness was addressing, or was about to address, the committee; that a police officer had approached defendant and asked him to sit down and be quiet; that defendant had ignored these instructions and subsequent orders to leave; and that he had continued to shout. The judge determined that at that point "defendant was effectively put under arrest" and "began to flail his arms and ... resist"; that he was then lifted off the

ground while he continued yelling, kicking and flailing his arms, and that, while being carried out, he had tried to kick Detective Gilbert "in the privates."

Two videotapes of portions of the committee hearing, prepared for news broadcasting, were admitted into evidence. One of these, broadcast over WWOR–TV, records scenes of defendant's seizure by the police and of his resistance to his arrest. The other, videographed for New Jersey Network News, records all or most of what took place at the podium during the meeting, including the chairman's reactions to what occurred. The audio portion of the New Jersey Network News videotape records defendant's shouts and other sounds associated with the relevant events. When an uproar was heard from the floor, the videocamera was turned toward defendant and it recorded him being carried out by four or five policemen. These videotapes are part of the record on appeal.

The Law Division judge before whom this case was tried *de novo* on the record consulted these videotapes. He found that defendant stood and began shouting loudly as the chairman was talking about balancing the Federal budget; that the chairman addressed defendant, "Would the gentleman please ... suspend, well no, to be quiet, okay;" that defendant was still yelling when the chair gave the floor to a witness; that the witness attempted to speak, but was interrupted by the defendant's yelling; and that defendant was then apprehended by the police. Significantly, the judge also found that the chair banged his gavel and told the police to "escort the defendant out," and that the police then lifted defendant up and forcibly removed him from the meeting.

The Law Division judge considered each of defendant's legal arguments and rejected them. He held that the New Jersey criminal laws which defendant was convicted of violating were not preempted by Federal law; that defendant's constitutional rights were not violated because the First Amendment does not guarantee him the right to disturb a public meeting; that the convictions were not against the weight of the evidence because defendant clearly disrupted the meeting and resisted arrest; and that his

right to a fair trial was not violated by the municipal court's refusal to enforce subpoenas to require the testimony of several of the congressmen who were present at the meeting, including the chair, or by various other discretionary rulings which defendant disputed. Defendant has asserted substantially the same arguments on appeal.

■ Because defendant's First Amendment challenge to his conviction for disturbing a public meeting is substantial, we are constitutionally required to make an independent examination of the facts on which the conviction is based. *NAACP v. Claiborne Hardware Co.*, 458 *U.S.* 886, 915–16 n. 50, 102 *S.Ct.* 3409, 3427 n. 50, 73 *L.Ed.*2d 1215, 1238 n. 50 (1982); *Cox v. Louisiana*, 379 *U.S.* 536, 545 n. 8, 85 *S.Ct.* 453, 459 n. 8, 13 *L.Ed.*2d 471, 478–79 n. 8 (1965); *Edwards v. South Carolina*, 372 *U.S.* 229, 235, 83 *S.Ct.* 680, 683, 9 *L.Ed.*2d 697, 701–02 (1963). For the purpose of that independent examination, we have carefully examined the relevant portions of the videotapes as well as the entire transcript of the trial testimony.

The videotapes show that immediately before the events which resulted in defendant's convictions, the period for questions from the floor had ended and a preselected speaker was to make a prepared statement from the podium. The chairman told the audience that there would be a short delay in the proceedings. He asked whether they were "enjoying this." There was some background noise and he banged the gavel once or twice to reduce the noise level. The chairman commented in an informal manner on the reason for passing a balanced budget amendment.

As the chairman was about to introduce the next speaker, defendant shouted, loudly enough for his voice to be picked up on the videotape, "Mr. Chairman!" Ignoring the exclamation, the chairman continued, "Now, we're going to . . . ." Defendant interrupted, "Mr. Chairman! Mr. Chairman!" The chairman addressed defendant, "The gentleman, would the gentleman, would the gentleman please . . . ." Defendant interrupted again with what sounds like, "May I be heard?" Someone else, probably a mem-

ber of the audience, answered, "No!" The chairman announced,
"Jeanne, Jeanne Borkowski is now ready to testify." Then defen-
dant's voice is heard again, but his statement as recorded on the
videotape is unintelligible.[1] The chairman attempted to silence
defendant, "Would the gentleman, would you ask the gentleman
to, to suspend, and to, well no, just to be quiet." The chairman
then turned to the witness, "Jeanne, you're now the witness."
The witness began testifying, "Thank you. I would like to thank
the members of the House Budget Committee...." At that
point, there was an uproar from the audience. The witness tried
to continue, "... for holding these field hearings ..." The uproar
still continued. The witness stopped. The video camera turned
toward defendant and recorded several policemen dragging him
and then lifting him to their shoulders. The chairman called to
the police:

> Now, hey wait, officers, just escort him out.... Now I would ask, I would ask the
> officers.... Okay, let's calm down now. I would ask the officers to let that, I
> don't know, to let that gentlemen back in here and we'll see if we can get a chance
> to hear from him at some point. But let me just tell you, the situation is simple.
> The situation is simple. Everybody wants to speak, and you can't just jump up and
> try to jump in front of thirty other people. We're doing the best we can. I think
> we're doing a pretty good job here of listening to you. So, it's not, let me just say
> to the, to the officials here that if, we would hope the gentleman could be brought
> back in, and he could get in line and if he gets called on it'll be great. It's not our
> intention to not hear from him but we've got to have order in here, folks. We don't
> have order, we can't proceed.

Our understanding of the material facts is informed by our
careful examination of the videotapes, by our review of the entire
transcript and by the deference that is due to the municipal court
judge's opportunity to observe the demeanor of the witnesses as
they testified. We conclude that defendant, in knowing violation
of the rules of the meeting, shouted to attract attention of the
chair and that this conduct undoubtedly "disturbed" the meeting
in the literal sense of that term. We also find that defendant

---

[1] There is what purports to be a verbatim transcript of the proceeding in the
Congressional Record, but it is less complete than the videotape.

resisted the arresting officers as they sought to remove him from the hall and as they were handcuffing him outside.

The sequence of events recorded on the videotapes is particularly significant for our determination of whether the State has proved that, before seizing defendant, the police warned him that he would be arrested if he did not sit down and stop shouting. The tape shows that the interval between defendant's first exclamation of "Mr. Chairman!" and his last shout is less than fifteen seconds. According to the officers, after defendant's first shout, which marks the beginning of the critical interval of less than fifteen seconds, Patrolman DeGraw, who was standing three or four yards away from defendant, approached him and told him to please be quiet and to be seated; then defendant yelled again; there was some communication, not described on the record, between a member of the congressional committee staff and Patrolman DeGraw, and the police officer again admonished defendant, still within the less-than-fifteen-second interval, to be seated and advised him that if he did so, he would be able to remain in the hall; when defendant continued yelling, he was told, still within the less-than-fifteen-second interval, that he had to leave. Finally, the officers testified, when defendant continued yelling, he was told that he was under arrest. That last yell marks the end of the fifteen-second interval. Defendant was then seized and carried away.

We emphasize that less than fifteen seconds was available for all of the warnings which Patrolman DeGraw and Detective Sniscak described and for their notification to defendant that he was under arrest.[2] Because of the brevity of the available time frame, we are convinced that not all of the warnings and the notification of arrest described by the police officers could have been given to

---

[2] Patrolman DeGraw testified that approximately ten seconds elapsed between the time defendant was first told to sit down and when an officer touched him. Detective Sniscak estimated the time between defendant's first shout and his being touched by an officer as "two to three minutes." The latter testimony is disproved by the videotape.

defendant. We cannot tell from the record which of the events they testified to did not, in fact, occur. But because some could not have happened within that period, the uncertainty about what did occur leads us to conclude that the State has failed to prove beyond a reasonable doubt that before defendant was seized, he was warned that he would be arrested or told he was under arrest. Defendant himself testified that after he had been taken out of the hall and while he was lying across the back of a car, he was told that he was under arrest. There is testimony that he struggled as he was being handcuffed while lying on the back of the car. But there is no testimony that defendant continued to resist arrest after he admits he was told that he was under arrest.

Later in this opinion, we will discuss how defendant's conviction for resisting arrest is affected by the State's failure to prove beyond a reasonable doubt that the police warned him in advance of their intention to effect his arrest. We will deal first, however, with the legal significance of the facts of the case as they affect defendant's conviction for disturbing a public meeting.

*N.J.S.A.* 2C:33–8 reads as follows:

A person commits a disorderly persons offense if, with purpose to prevent or disrupt a lawful meeting, procession or gathering, he does an act tending to obstruct or interfere with it physically.

The comments to this section state:

As noted, the section is limited to physical interference. . . . That is not to say that speech could never be physically disruptive; where an actor's speech was intended to make it impossible for the person addressing the meeting to be heard, speech would constitute a physical obstruction. Similarly, if a person with no privilege to speak in a meeting repeatedly interrupted it, he might well be in violation of the section whatever the content of his speech.

[Cannel, *New Jersey Criminal Code Annotated,* comment 2 on *N.J.S.A.* 2C:33–8 (1997) (referring to Commission Commentary).]

There are no reported decisions construing *N.J.S.A.* 2C:33–8. However, there are two reported cases which applied its predecessor, *N.J.S.A.* 2A:170–28 (repealed 1979), to persons charged with disturbing public deliberative meetings. *State v. Smith,* 46 *N.J.* 510, 218 *A.*2d 147, *cert. denied,* 385 *U.S.* 838, 87 *S.Ct.* 85, 17 *L.Ed.*2d 71 (1966) (public meeting of Trenton City Council); *State*

*v. Moore,* 101 *N.J.Super.* 419, 244 *A.*2d 522 (App.Div.1968)(public meeting of Newark Planning Board). *See also State v. Morgulis,* 110 *N.J.Super.* 454, 266 *A.*2d 136 (App.Div.1970) (spectator's disorderly conduct at a basketball game). That statute provided:

Any person who by noisy or disorderly conduct disturbs or interferes with the quiet or good order of any place of assembly, public or private, including schools, churches, libraries and reading rooms, is a disorderly person.

*See State v. Smith, supra,* 46 *N.J.* at 514, 218 *A.*2d 147.

Six defendants were convicted for causing the disruption which was the subject of *State v. Smith.* The disruption took place at a public meeting of the governing body of the City of Trenton called to consider an urban redevelopment project. After two disturbances in the area where one of the defendants, Callender, was sitting, the president of the council called for quiet so that speakers could be heard. The president warned that if the persons creating the disturbance did not stop, he would have to ask them to leave or ask to have them removed by the sergeant-at-arms. Callender retorted, " 'We haven't started to disrupt your meeting yet,' or 'We have not begun to interrupt your meeting yet.' " *Id.* at 513, 218 *A.*2d 147. The president of the council understood this response as a threat "that the disturbances would be repeated and in greater volume"; he therefore directed a police officer to escort Callender from the room. *Ibid.* The police dragged and carried him out of the room. As he was removed, persons near him were chanting, "Freedom!" Callender was deposited in the corridor outside the meeting room and the five co-defendants seated themselves there in a semi-circle, legs and arms intertwined, partially blocking the exit. *Id.* at 513–14, 218 *A.*2d 147. Affirming the convictions, the Court stated:

Callender . . . was ordered out because, in response to the president's call for quiet, he threatened even greater disruption of this public meeting. . . . [T]he record amply justifies the belief of the president of the Council that defendant intended to interfere with the good order of the hearing. But the more fundamental answer is that the decision of the presiding officer cannot be tested by physical resistance. . . . The chair must have the power to suppress a disturbance or the threat of one, and the power to quell a disturbance would be empty if its exercise could be met by still another disturbance designed to test the officer's judgment.

[*Id.* at 516–17, 218 *A.*2d 147.]

*State v. Moore, supra,* arose out of a disturbance at a public hearing before the Newark Planning Board on the subject of whether a section of the city should be designated as "blighted" and therefore eligible for an urban renewal program involving the construction of the New Jersey College of Medicine and Dentistry. Before the hearing, the chairman designated the defendant as the floor manager for a majority of the persons attending the meeting. While a speaker was addressing the Board, another person arose for "a point of information." The chairman ruled her out of order, refusing to permit the interruption. The defendant went to the microphone, quoting from *Robert's Rules of Order* in support of the right of the member of the audience to interrupt the speaker for a point of information. The chairman ruled that the defendant was out of order because he was not following the procedure established for the meeting. The defendant persisted in arguing with the chairman, calling the chairman a fool and insisting on his right to appeal the chairman's ruling. When the chairman continued to rule him out of order, the defendant asked him to disqualify himself because he was mentally incompetent. Finally, the chairman asked three times that the microphone be cleared so that the meeting could proceed. After a brief recess, the defendant resumed his quarrel with the chairman. When the chairman again asked him to leave the microphone and ruled him out of order, the defendant replied that the chairman would have to order the police to remove him. This defiance of the chairman's rulings continued for between twelve and fifteen minutes. The chairman did not instruct the policeman to arrest the defendant, but the police officer told the defendant that defendant would have to comply with the chairman's directions and, if he persisted in disregarding them, that he would be removed and probably arrested. Finally, after the meeting was disrupted and the hall was noisy, the defendant was led from the chamber by a police officer who placed him under arrest. 101 *N.J.Super.* at 421–22, 244 *A.*2d 522. We affirmed defendant's conviction, holding that his conduct violated *N.J.S.A.* 2A:170–28 (repealed 1979) and was not protected by the First Amendment. 101 *N.J.Super.* at 425, 244 *A.*2d 522.

██ These cases clearly establish the constitutionality of *N.J.S.A.* 2C:33–8. In that respect, they are consistent with the holdings of cases decided by courts throughout the country which have upheld similar statutes against First Amendment challenges. *See, e.g., In re Kay,* 1 *Cal.*3d 930, 83 *Cal.Rptr.* 686, 464 *P.*2d 142 (1970); *State v. Hardin,* 498 *N.W.*2d 677 (Iowa 1993); *State v. Schwing,* 42 *Ohio St.*2d 295, 328 *N.E.*2d 379 (1975); *Morehead v. State,* 807 *S.W.*2d 577 (Tex.Crim.App.1991).

In *State v. Smith, supra,* the decision to remove the trouble-maker, by force if necessary—that is, to arrest him—was made by the chairman of the meeting. In *State v. Moore, supra,* the troublemaker's immediate forcible removal was indispensable if the chairman's control of the meeting was to be restored. In the face of the defendant's taunts that he would relinquish the microphone only if removed by force, the chairman's order that he clear the microphone was tantamount to a direction to the police to arrest him if he did not obey.

██ In the present case, the chairman of the meeting told defendant to be quiet, but he did not order defendant to be removed. When the chairman admonished the police to "just escort him out," defendant was already in a horizontal position, being carried out by the policemen. In the context shown by the videotapes, the admonition was clearly a direction to walk the defendant out, not to carry him out like a log. In fact, the chairman expressed his anticipation that defendant would return to the meeting. There is no evidence whatsoever that defendant was removed from the meeting by order of the chair.

This distinction is important. In some instances, conduct which disturbs a meeting may be so inconsistent with or so immediately obstructive of its continued functioning that policemen who are present to maintain order have the right and duty to remove the troublemaker without an express direction from the chair. Perhaps the conduct of the defendant in *State v. Moore, supra,* had become so outrageous as to fall into that category. But defendant's conduct in the present case had not reached the stage

where it was so outrageous that the police could appropriately act without direction from the chair. *See State v. Schwing, supra,* 328 *N.E.*2d at 386 (holding that the only disturbances of meetings which are not constitutionally protected are those "which cause a lawful assemblage to terminate in an untimely manner" or "which substantially impair the conduct of the assemblage"); *Morehead v. State, supra,* 807 *S.W.*2d at 581 (constitutional considerations require statute to be construed as criminalizing only "physical acts or verbal utterances that *substantially* impair the ordinary conduct of lawful meetings and thereby curtail the exercise of others' First Amendment rights").

What is permissible conduct at a public meeting depends, of course, on the nature and setting of the meeting. We assume that Congressman Kasich was entitled to keep a strict rein on the proceedings which are at issue here, particularly because of the large number of people who were present in a crowded hall. Nonetheless, the decision whether to relax the rules which he had announced for the meeting or to enforce them strictly was up to him. It would be a dangerous precedent for us to hold that the police, acting on their own initiative and without an express direction from the chair, were entitled to arrest a member of the audience for so brief a deviation from the prescribed procedures as that committed by defendant. As the court declared in *In re Kay, supra,* a leading case on the interpretation of statutes which criminalize disturbing a public meeting, the court said:

> The Constitution does not require that any person, however lofty his motives, be permitted to obstruct the convention or continuation of a meeting without regard to the implicit customs and usage or explicit rules governing its conduct. .... *This inhibition does not mean, however, that the state can grant to the police a "roving commission" to enforce Robert's Rules of Order since other First Amendment interests are likewise at stake.*
>
> [*Id.,* 83 *Cal.Rptr.* at 691, 464 *P.*2d at 147 (emphasis added) (footnote and citations omitted).]

*See Cox v. Louisiana, supra,* 379 *U.S.* at 557–58, 85 *S.Ct.* at 466, 13 *L.Ed.*2d at 485–86 (unconstitutional for public official, such as police officer, to regulate exercise of First Amendment rights under color of selective enforcement of state statute).

█ There may be instances where immediate intervention by the police without direction from the chair is necessary to protect the safety of the assemblage or the public at large. The respective functions of the chair and the attending police officers differ in some respects. The concern of the chair is to maintain decorum in order to accomplish the public purpose of the meeting. The police officer's presence is, at least in part, to guard against imminent danger arising from the conduct of the disturber. When faced with that danger, the objectively reasonable police officer's choice to intervene need not wait for an order from the chair of the meeting who, because· of a tolerant nature or other reasons, may ignore the potential for physical harm to others present at the public meeting.

There was no justification for the police to act as precipitously as they did in the present case. Their action was not necessary to curb a disturbance that threatened the meeting or public safety. The principal disturbance was caused by their arresting defendant and carrying him out of the hall. As the court declared in *In re Kay, supra,* the Constitution does not authorize the police to exercise a " 'roving commission' to enforce *Robert's Rules of Order.*" 83 *Cal.Rptr.* at 691, 464 *P.*2d at 147. In order to sustain *N.J.S.A.* 2C:33–8 against a First Amendment challenge, we hold that defendant's brief shouts for recognition did not violate that statute and that the police were not authorized to arrest him without direction from the congressman presiding over the meeting.

█ That brings us to a consideration of defendant's conviction for violation of *N.J.S.A.* 2C:29–2, resisting arrest.[3] Although we have held that his arrest was unlawful because it was not authorized by *N.J.S.A.* 2C:33–8, that would not necessarily be a valid

---

[3] We note that although *N.J.S.A.* 2C:29–2 is captioned, "resisting arrest," its text condemns a person who "purposely *prevents* a law enforcement officer from effecting a lawful arrest. . . ." (emphasis added). No point has been made of the difference between "resisting" and "prevent[ing]" and the distinction, if any, is not relevant to our decision.

defense to the charge of violating *N.J.S.A.* 2C:29–2. That statute states:

It is not a defense to a prosecution under this subsection that the law enforcement officer was acting unlawfully in making the arrest, provided he was acting under color of his official authority and provided the law enforcement officer announces his intention to arrest prior to the resistance.

*See State v. Mulvihill,* 57 *N.J.* 151, 155–56, 270 *A.2d* 277 (1970); *State v. Koonce,* 89 *N.J.Super.* 169, 184, 214 *A.2d* 428 (App.Div. 1965). In the present case, the arresting officers were clearly acting under color of their official authority in arresting defendant. However, we have held that the State failed to prove beyond a reasonable doubt that the police had announced their intention to arrest defendant prior to his resistance. The State has therefore failed to prove one of the two conditions which must be established if a defendant is to be convicted of resistance to an unlawful arrest pursuant to *N.J.S.A.* 2C:29–2. Defendant's conviction for violating that statute cannot, therefore, be sustained.

The judgment of conviction is therefore reversed and the case is remanded for the entry of a judgment acquitting defendant of violating *N.J.S.A.* 2C:29–2 and *N.J.S.A.* 2C:33–8.