**NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1301-22

STATE OF NEW JERSEY,

Plaintiff-Respondent,

v.

ENDY ROLANDO CRUZ CRUZ,
a/k/a GUSTAV GONZALEZ,
GUSTAVO MORALES, and
GUSTAVO MORALESGONZALEZ,

Defendant-Appellant.

---

Argued February 26, 2024 – Decided March 15, 2024

Before Judges Sabatino, Marczyk, and Chase.

On appeal from the Superior Court of New Jersey, Law Division, Cumberland County, Municipal Appeal No. 2-22.

Elizabeth M. Trinidad argued the cause for appellant (Trinidad Law Office, LLC, attorneys; Elizabeth M. Trinidad, on the briefs).

Jeffrey Nicholas Krachun, Assistant Prosecutor, argued the cause for respondent (Jennifer Webb-McRae,

Cumberland County Prosecutor, attorney; Jeffrey Nicholas Krachun, of counsel and on the brief).

PER CURIAM

Defendant Endy Rolando Cruz Cruz appeals from a November 16, 2022 Law Division order upholding his municipal court convictions and sentence of a six-month suspension of driving privileges with associated fines and court costs. We affirm in part, vacate in part, and remand for proceedings consistent with this opinion.

## I.

The only witness to testify at trial was New Jersey State Police Trooper Quanzell Lambert. He testified that on October 11, 2019, he was in uniform and in a marked patrol car stationed along Route 49 in Fairfield Township when he observed a vehicle speeding and failing to maintain its lane. Trooper Lambert initiated a traffic stop and approached the vehicle. He identified himself as a State Police Trooper and asked the driver for identification and other documents. Trooper Lambert testified he observed "a little language barrier," however, defendant "could understand some. It was pretty broken, but he understood some things and I was trying to speak in Spanish as best I could to get him to understand."

Trooper Lambert testified defendant produced identification from Mexico but no proof of a valid driver's license. Suspecting defendant was intoxicated because of his behavior and physical demeanor, Trooper Lambert instructed defendant to exit the vehicle and perform field sobriety tests. During the testing, Trooper Lambert determined defendant failed and should be placed under arrest. At the end of testing, Trooper Lambert instructed defendant to turn around to complete another test, and when he did, Trooper Lambert grabbed defendant's hands and placed them behind his back to handcuff him. At that time, defendant broke the officer's grip and turned around to face him. Trooper Lambert then placed defendant face down on the hood and brought his hands behind his back to handcuff him. Trooper Lambert testified the action of breaking his grip was the basis for the resisting arrest charge. He also testified after defendant was handcuffed and searched, defendant used his torso and legs to push back against Trooper Lambert to avoid being placed in the patrol car.

The State then played footage from the patrol car's dashboard camera, which was entered into evidence as S-3. The dashcam video captured Trooper Lambert identifying himself to the car's occupants as a police officer and defendant responding, "No English." Trooper Lambert then attempted to ask defendant if he had been drinking, using both English and the Spanish word

"cerveza" ("beer"), to which defendant responded in the negative. The video showed Trooper Lambert administering four field sobriety tests in front of defendant's car. Defendant responded to some of Trooper Lambert's instructions and questions by speaking Spanish, "No entiendo" ("I don't understand") or with, "No English. Sorry." The video shows Trooper Lambert physically demonstrating some of the field sobriety tests to defendant.

Trooper Lambert then instructed defendant, "Turn around. Next test, turn around." As defendant turned around, on his own he raised both hands over his head. Trooper Lambert then took both defendant's hands into his hands and started to pull them down behind defendant's back to defendant's waist area, while simultaneously saying "move your hands behind your back." As he moved defendant's hands down, defendant broke the grip, turned to face Trooper Lambert and asked in Spanish, "Qué pasó?" ("What happened?"). Trooper Lambert said, "Yo, yo, yo, yo. Hands behind your back. Put your hands behind your back." In order to secure defendant, Trooper Lambert turned him around, placed him over the hood of the car, unclipped his handcuffs, and handcuffed him without further incident. As the handcuffs were being placed on defendant, he told his passenger, in Spanish, to call her sister. After defendant was

handcuffed, he began asking Trooper Lambert for "abogado" ("lawyer") while also repeating, "No English."

The video shows Trooper Lambert escorted defendant to the area outside the rear passenger door of his patrol car. From this point, both Trooper Lambert and defendant were outside the view of the dashcam, but the microphone attached to Trooper Lambert's body-worn camera captured the audio of their interactions. While continuing to ask for a lawyer, defendant told Trooper Lambert, "Hey, hey, mi mujer? Mi mujer, okay? Mi mujer?" ("my woman") to which Trooper Lambert responded, "You're making it harder than it needs to be."

The dashcam captured defendant's passenger opening her car door, taking out her phone, and attempting to communicate with defendant and Trooper Lambert. She told Trooper Lambert, in English, the person on the phone was her sister.[1] Trooper Lambert instructed her to get back in the vehicle, which she did. However, she soon stood up from the vehicle again and remained by her open door.

---

[1] Other footage from S-3 shows the passenger's family member later arrived and served as a translator between the police officers, passenger, and defendant.

Approximately five minutes after the handcuffing, the audio recording captured the opening of the patrol car door. Defendant again asked for an attorney, and Trooper Lambert can be heard saying, "Get in the car, bro." Defendant can be heard calling loudly to the passenger. The passenger walked away from the car, still on the phone, and out of view of the dashcam. The audio recording captures loud, overlapping, and repeating conversations: Trooper Lambert telling the passenger to get back in the vehicle, the passenger telling Trooper Lambert, "My sister, okay?" and defendant calling the passenger's name[2] and telling her, "Graba la video! Graba!" ("Record a video! Record!"). The dashcam shows the passenger briefly returning to the car, but then re-approaching Trooper Lambert and defendant. The dashcam appears to shake slightly for approximately thirty seconds before the audio captures the sound of the patrol car door closing.

Trooper Lambert testified during that portion of the recording, in which neither he nor defendant were visible, and in which the passenger moved in and out of view, he was trying to place defendant into his patrol car, but defendant physically resisted those efforts. Trooper Lambert testified defendant "was

[2] The passenger's name is not reflected in the record, but in the recording, defendant addresses her by the common nickname "Flaca."

using his feet and legs, his torso, to like stop me from . . . putting him in the vehicle." Trooper Lambert's body-worn camera was knocked from his person as he placed defendant in the car. Trooper Lambert testified because the passenger was approaching, he "forcibly pushed [defendant] in the vehicle just in case [the passenger] got a weapon or anything . . . ."

On cross-examination, Trooper Lambert was asked whether he ever told defendant he was under arrest. Trooper Lambert testified, "I did, ma'am. I never got to get it fully out. I said your (sic) under arrest, and that's when he pulled away." After the dashcam video was replayed a second time, the following ensued:

> [DEFENSE COUNSEL]: So you never said the word arrest, did you, Trooper?
>
> ....
>
> [LAMBERT]: I did. I just didn't fully – what did you say? It's on the – whatever is said on there, because like you said, it was vehicles flying by.
>
> There was a lot of other things going on. You might have not fully heard the word come out of my mouth but I – you could hear me advising him he was under arrest and he's breaking my grip.

Defense counsel also asked, "when you wanted [defendant] to turn around, he turned – for what you said was the last test; right? . . . The next test. You said next test." Trooper Lambert replied, "Yes, ma'am." He explained:

> Ma'am, so I do that so people when – what I do, as far as I say that because I don't want people to freak out when I sa[y] they're under arrest. So I – if they're under the influence, they'll just, oh, I got another test. I'm doing well.
>
> And then I'll put their hands behind their back and then I'll place them under arrest and tell them they're under arrest. I don't do that as a test to trick. It's more of to say for my safety, so they don't overreact because a lot of people don't want to hear that they're being placed under arrest.

Trooper Lambert also conceded he communicated through physical gestures how he wanted defendant to complete the tests.

On redirect, Trooper Lambert was asked whether defendant knew he was being placed under arrest, to which Trooper Lambert testified, "[t]hat's unknown" and "[i]t was up to him." Trooper Lambert also testified his placing handcuffs on defendant's wrists was a physical cue to alert defendant he was being placed under arrest.

Defendant was ultimately issued citations for speeding, N.J.S.A. 39:4-98; driving without a license, N.J.S.A. 39:3-10; and obstruction of windshield for vision, N.J.S.A. 39:3-74; as well as a summons for two disorderly persons offenses, resisting arrest, N.J.S.A. 2C:29-2(a)(1), and obstruction of administration of justice, N.J.S.A. 2C:29-1(a). Trooper Lambert testified he did

not issue a ticket for driving while intoxicated ("DWI") because an alcohol breath test reflected a blood alcohol concentration of "double zero."

The defense did not call any witnesses. After closing arguments, the municipal court judge found defendant guilty of the motor vehicle violations: speeding, driving without a driver's license, and driving with an obstructed view. The court also found defendant guilty of resisting arrest and obstruction of justice. As to the disorderly persons resisting arrest charge, the court found an adequate basis for Trooper Lambert to have arrested defendant for DWI. As to whether defendant understood the nature of the interaction to be an arrest, the court remarked:

> I think there are some things that are just universal in modern society that require no language understanding . . . [including] when an officer is in uniform is going to put you under arrest. That's pretty much a universal cultural understanding when an officer puts his hands on you with handcuffs, that you are under arrest.

The court found defendant's repetition of the word "abogado," the Spanish word for "lawyer," as well as defendant's responsiveness to some of Trooper Lambert's instructions, indicated his understanding he was being arrested. The municipal court judge then imposed fines and costs totaling $1,704, including a $507 penalty for driving without a license, and $350 for each disorderly persons

charge. Additionally, defendant's driving privileges were suspended for six months.

Defendant appealed his convictions and sentence for a trial de novo before the Law Division. Defendant argued the municipal court judge's findings were inconsistent because the court found both that Trooper Lambert's instructions to turn around were a ploy to make defendant believe he was undergoing a fifth field sobriety test, and that Trooper Lambert had provided sufficient warning defendant was being placed under arrest. Defendant also argued the law should not be interpreted to place expectations on arrestees based on gestures and nonverbal conduct alone, as those may not be sufficient to give rise to the knowledge an arrest is taking place. Defendant referenced federal guidelines for law enforcement communicating with those of limited English-language proficiency, which defendant argued were binding on New Jersey law enforcement officers.

Defendant also maintained the statute for resisting arrest requires a clear announcement an arrest is taking place, and asking for an attorney should not be found tantamount to knowledge of an arrest. In defendant's view, the State had not proven beyond a reasonable doubt the fact of the impending arrest had been communicated to the defendant in a manner a reasonable person in his position

would understand. Defendant also argued because the word "arrest" was not audible on the video, it was not shown beyond a reasonable doubt that he heard any announcement. Defendant also argued the maximum penalty for driving without a license was disproportionate and imposed without making the requisite individualized finding of aggravating and mitigating factors.

In a written opinion rendered on November 16, 2022, with an accompanying order, the Law Division judge upheld defendant's convictions and sentence. The court found the record substantiated the municipal court's findings as to defendant's sufficient understanding of the circumstances. While the court acknowledged the recording did not capture Trooper Lambert stating, "you are under arrest," it held defendant's "understanding of his arrest did not have to derive solely from verbal understanding" and his understanding could have derived from limited English understanding, body language, physical gestures, and Trooper Lambert's actions, all which demonstrated Lambert's intent to arrest defendant. The judge rejected defendant's reliance on State v. Kane, 303 N.J. Super. 167, 182 (App. Div. 1997), and State v. Marquez, 202 N.J. 485, 508 (2010), as both legally and factually distinguishable, and found the State carried its burden to prove defendant guilty of both resisting arrest and obstructing administration of law beyond a reasonable doubt.

The imposition of a $507 penalty for driving without a license was affirmed, and consequently defendant's argument the fine was disproportionate to the disorderly persons fines was rejected. The Law Division judge also held the municipal court judge sufficiently placed his reasons for the sentence on the record.

This appeal follows with defendant making the following arguments:

POINT I

THE TRIAL COURT MISUNDERSTANDS STATE V. KANE, 303 N.J. SUPER. 167 (APP. DIV. 1997), GIVEN THAT THE RELEVANT PORTIONS OF KANE –RELATING TO THE ANNOUNCEMENT REQUIREMENTS FOR A CONVICTION UNDER [N.J.S.A.] 2C:29-2 (RESISTING ARREST)— DO NOT HINGE ON WHETHER THE UNDERLYING ARREST WAS LAWFUL OR NOT.

POINT II

THE TRIAL COURT ERRED BY FINDING THAT STATE v. MARQUEZ, 202 NJ. 485 (2010) "HAS NO RELATION TO APPELLANT'S CASE" AND IT ERRED BY DISTINGUISHING MARQUEZ SOLELY ON THE BASIS OF MR. MARQUEZ SPEAKING NO ENGLISH WHATSOEVER.

POINT III

THE TRIAL COURT ERRED WHEN IT FOUND THAT ASKING FOR AN ATTORNEY IS TANTAMOUNT TO HAVING KNOWLEDGE OF AN ARREST OF ONE'S SELF, EITHER ABOUT TO OCCUR OR HAVING ALREADY OCCURRED.

POINT IV

THE TRIAL COURT ERRED WHEN IT IMPLIED THAT BEING A POLICE OFFICER, UNIFORMED [AND] ON DUTY, PROVIDED A SUFFICIENT LEGAL BASIS FOR TROOPER LAMBERT TO BE ABLE TO ARREST [DEFENDANT] AND THEN PUNISH HIM FOR HIS NATURAL CONFUSION & FEARFUL REACTION.

POINT V

IN LIGHT OF THE TWO TITLE 2C CHARGES, UNDER A TOTALITY OF THE CIRCUMSTANCES, THE TRIAL COURT ERRED WHEN IT DISMISSED OUT OF HAND THE RELEVANCE OF [DEFENDANT] NOT HAVING BEEN CHARGED WITH DUI AS A RESULT OF HIS WARRANTLESS ARREST IN OCTOBER 2019.

POINT VI

THE TRIAL COURT COMMITTED LEGAL ERROR BY UPHOLDING THE FINDINGS, REACHED BELOW, THAT AN "ARREST BY IMPLICATION" (VIA PHYSICAL PRESENCE AND NON-VERBAL ACTIONS) IS SUFFICIENT FOR A CONVICTION TO LIE UNDER [N.J.S.A.] 2C:29-l(a) [AND] 2C:29-2(a)(l), THAT IS: THE RESISTING ARREST & OBSTRUCTION OF JUSTICE STATUTES.

POINT VII

THE TRIAL COURT INCORRECTLY FOUND THAT [DEFENDANT] HAS ARGUED THAT HE "UNDERSTOOD NOTHING" SAID TO HIM IN ENGLISH, WHEN IN FACT HE HAS ARGUED HE IS "LEP" (= LIMITED ENGLISH PROFICIENT).

POINT VIII

[DEFENDANT] REITERATES THAT MAXIMUM PENALTIES COULD NOT HAVE BEEN IMPOSED ON HIM FOR VIOLATING [N.J.S.A.] 39:3-10 WITHOUT AN INDIVIDUALIZED ASSESSMENT, AND ARGUES THE LAW DIVISION COMMITTED GROSS LEGAL ERROR BY CLAIMING THAT "BEING CONVICTED" WAS BASIS ENOUGH FOR SENTENCING [DEFENDANT] TO A SUSPENSION OF PRIVILEGES AND MAXIMUM ALLOWABLE FINE.

II.

Appellate review of a de novo conviction in the Law Division, following a municipal court appeal, is "exceedingly narrow." State v. Locurto, 157 N.J. 463, 470 (1999). We "focus[] on whether there is 'sufficient credible evidence . . . in the record' to support the trial court's findings." State v. Robertson, 228 N.J. 138, 148 (2017) (quoting State v. Johnson, 42 N.J. 146, 162 (1964)). Under the "two-court rule," we "ordinarily should not undertake to alter concurrent findings of facts and credibility determinations made by two lower courts absent a very obvious and exceptional showing of error." Id. at 148 (quoting Locurto, 157 N.J. at 474). This deferential standard applies to a trial court's fact-finding based on video evidence. State v. McNeil-Thomas, 238 N.J. 256, 272 (2019).

Appellate review of a sentencing court's determination is guided by an abuse of discretion standard. State v. Torres, 246 N.J. 272 (2021). Such

deference applies so long as "the trial judge follows the Code and the basic precepts that channel sentencing discretion." State v. Trinidad, 241 N.J. 425, 453 (2020) (quoting State v. Case, 220 N.J. 49, 65 (2014)).

A.

Defendant argues his respective convictions of resisting arrest and obstruction of justice were improper due to the Law Division's misapplication of Kane, 303 N.J. Super. at 167, and State v. Branch, 301 N.J. Super. 307 (App. Div. 1997). Defendant first posits under Kane, law enforcement officers must verbally announce their intent to arrest prior to an arrest for a conviction for resisting arrest to stand. In defendant's view, the State had not proven beyond a reasonable doubt the fact of the impending arrest had been communicated to defendant in a manner a reasonable person would understand.

The resisting arrest statute provides, "Except as provided in paragraph (3) [detailing the bases for a third-degree offense], a person is guilty of a disorderly persons offense if he purposely prevents or attempts to prevent a law enforcement officer from effecting an arrest." N.J.S.A. 2C:29-2(a)(1) (emphasis added). After delineating the different levels of this offense, the statute continues, "It is not a defense to a prosecution under this subsection that the law enforcement officer was acting unlawfully in making the arrest, provided he was

acting under the color of his official authority and provided the law enforcement officer announces his intention to arrest prior to the resistance." N.J.S.A. 2C:29-2(a) (emphases added).

A conviction for obstructing administration of law also requires the State to prove a defendant acted purposely:

> A person commits an offense if he purposely obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from lawfully performing an official function by means of flight, intimidation, force, violence, or physical interference or obstacle, or by means of any independently unlawful act.
>
> [N.J.S.A. 2C:29-1 (a) (emphasis added).]

This level of culpability is defined as follows:

> A person acts purposely with respect to the nature of his conduct or a result thereof if it is his conscious object to engage in conduct of that nature or to cause such a result. A person acts purposely with respect to attendant circumstances if he is aware of the existence of such circumstances or he believes or hopes that they exist.
>
> [N.J.S.A. 2C:2-2(b)(1) (emphasis added).]

In Kane, a man attended an official Congressional hearing being held in Manville. 303 N.J. Super. at 169. After he repeatedly attempted to address the committee chair from the crowd, "four or five policemen who were in attendance to maintain order seized [Kane], carried him out, handcuffed him, and took him

to police headquarters where he was charged." Id. at 169-70. In municipal court, an officer testified he "advised [the defendant] he was under arrest," although Kane denied any officer said anything to him before removing him. Id. at 170-71. The municipal court judge found that after ignoring the police officers' instructions, "defendant was effectively put under arrest." Id. at 171. The case was tried de novo before a Law Division judge who reviewed video footage of the meeting. The judge found the committee chair "told the police to 'escort the defendant out'" which was sufficient notice of the defendant's impending arrest. Id. at 172.

On appeal, we reversed, finding the recordings and the officers' testimony reflected only a short interval of time in which the defendant could have been notified of his impending arrest. Id. at 175. We were "convinced that not all of the warnings and the notification of arrest described by police officers could have been given to defendant." Id. at 175-76. This led us to conclude the State failed to prove the advance warning beyond a reasonable doubt. Id. at 176. Because the arrest was found to be unlawful, a conviction for resisting required the State to prove both the announcement and that the officers were acting under the color of their official authority. Id. at 182. The conviction was therefore reversed. Ibid.

By the plain meaning of the statute, the announcement requirement is not an element of the crime of resisting arrest that the State must prove beyond a reasonable doubt in all cases. Rather, the State's failure to prove beyond a reasonable doubt the announcement requirement was satisfied will provide a standalone basis for the reversal of a conviction <u>only</u> where the arrest itself was unlawful. Unlike in <u>Kane</u>, the arrest in this case is undisputed as lawful. Therefore, the defense of unlawful arrest is not available to defendant, and so whether the State proved a verbal announcement is not relevant to the analysis of the particular facts of this case.

B.

Even though the announcement requirement is inapplicable to defendant's lawful arrest, the State nonetheless bore the burden to show defendant acted purposely, which necessarily includes proving beyond a reasonable doubt he understood the attendant circumstances. The ability of an officers' words and actions to impart that understanding, such that resisting the arrest could be proven purposeful, has been explored by our courts.

In <u>Branch</u>, a plainclothes officer identified himself as police and told the defendant to stop, but the defendant fled. 301 N.J. Super. at 321. The defendant was tackled and was being placed under arrest when he resisted and pulled a

weapon on the officer. Ibid. Branch challenged his conviction under N.J.S.A. 2C:29-2(a) because the detective did not specifically state, "You're under arrest."[3] Ibid. We rejected the failure to announce as a categorical bar to the finding of the requisite mens rea, stating it "would only be one factor to be considered in the overall sequence of events leading to the arrest." Ibid.

In State v. Ambroselli, the defendant was found walking through a neighborhood with torn clothing and bleeding profusely from a head wound. 356 N.J. Super. 377, 381 (App. Div. 2003). When an officer attempted to speak with him, the defendant swung at her and fled, and then swung at the other officers she called for backup. Id. at 381-82. The officers subdued the defendant with pepper spray and handcuffed him but did not specifically inform him he was being placed under arrest. Id. at 382. The defendant was charged with both aggravated assault and third-degree resisting arrest under N.J.S.A. 2C:29-2(a)(3), both offenses requiring the defendant to have acted purposely. Id. at 383.

During the jury charge, the judge initially read language closely mirroring the definition of "purpose" under N.J.S.A. 2C:2-2(b)(1), but then "added his own

---

[3] This was argued not under the announcement requirement, but to attack the State's proof of a purposeful mens rea. 301 N.J. Super. at 321.

gloss on the definition: 'And again, this is not written in the law but you can consider the definition of purposeful and maybe the contrary definition of by accident.'" Id. at 385. We overturned the conviction in Ambroselli based on these "fatally flawed" charges on the requisite mental state. Id. at 386. Given the defendant's debilitated physical condition and considerable blood loss at the time of the arrest, the possibility of jury confusion over whether the defendant's mental state satisfied the requisite purpose mandated reversal of the convictions. Id. at 388.

Here, both the municipal and trial courts found even without clear evidence of a formal verbal announcement, defendant's responsiveness to some of Trooper Lambert's English-language requests, as well as context clues and signals, provided sufficient proof defendant understood an arrest was taking place, and that he was guilty of resisting that arrest. Both courts also found defendant's resistance to being placed in the patrol car, well after being placed in handcuffs, supported his conviction of obstruction beyond a reasonable doubt.

Defendant's understanding "with respect to attendant circumstances," necessary for a finding of purposeful mens rea, could only be derived from contextual clues. N.J.S.A. 2C:2-2(b)(1) (emphasis added). Essentially, defendant argues he was mistaken about the facts of the attendant circumstances.

A mistake as to a matter of fact, such as whether an arrest is taking place, can serve as a defense if it "negatives the culpable mental state required to establish the offense[.]" N.J.S.A. 2C:2-4(a)(1). "[E]ven an 'unreasonable' mistake, i.e., negligence, may negate the mental state required for criminal liability when . . . purpose[] is required for conviction[.]" State v. Wickliff, 378 N.J. Super. 328, 334-35 (App. Div. 2005) (citing State v. Sexton, 160 N.J. 93, 105-07 (1999)).

Given the testimony and video evidence, the State could not prove beyond a reasonable doubt at the point in the interaction when defendant turned to face Trooper Lambert and broke the grip, his manifest purpose was to resist arrest. The video evidence and audio recording capture defendant repeatedly telling Trooper Lambert he did not understand his instructions during the sobriety tests. When asked, "[d]id [d]efendant know you were placing him under arrest?" Trooper Lambert replied, "That's unknown. That's up to [him]." Trooper Lambert acknowledged he told defendant to turn around under the stated pretext that he was conducting another field sobriety test. The video captures defendant's apparent lack of understanding when Trooper Lambert grabbed defendant's hands while defendant was faced away from Trooper Lambert and then he turned to Trooper Lambert and asked "Qué pasó?" ("What happened?"). The audio and video evidence reflect the unbuttoning of Trooper Lambert's

handcuffs after defendant broke the attempted grip, was turned back around, placed on the hood of the car by Trooper Lambert, and after his hands were restrained behind his back.

However, after Trooper Lambert handcuffed defendant, walked him towards his police car, and opened the back door, there would be no similar doubt as to defendant's understanding of the circumstances at that later point in time. By the time of the interactions at the patrol car between defendant, the passenger, and Trooper Lambert, defendant had been in handcuffs for over five minutes. It is not reasonable to find he mistakenly believed he was not being arrested at that point. Both lower courts credited Trooper Lambert's unrebutted testimony concerning defendant's movements and the shaking of the dashcam video as evidence defendant physically resisted being placed in the patrol car. As succinctly stated by the Law Division judge, "[defendant's] conduct . . . physically resisting the officer's efforts to place him in the patrol car . . . support [defendant's] conviction beyond a reasonable doubt." Defendant's appellate brief also concedes, "[i]t is undisputed that there was a physical scuffle between Trooper Lambert and [defendant] around the time that both men had reached the trooper's patrol car." As such, while the resisting arrest charge was not proven

beyond a reasonable doubt, the conviction for obstruction was, by evidence of his subsequent attempt to avoid being placed in the patrol car.

C.

Defendant next argues the Law Division erred by declining to apply Marquez, 202 N.J. at 508, which concerned a defendant's ability to understand the statutorily mandated consequences of refusing to submit to an alcohol breath test, to charges of resisting arrest and obstruction. In Marquez, the defendant was arrested for DWI. Id. at 489. The defendant spoke no English and confirmed that to the arresting officer, who nonetheless read an extensive statement, written in English and detailing the consequences of refusing to submit to an alcohol breath test. Ibid. At trial, the State did not dispute the defendant's lack of understanding. Id. at 490. He was convicted both in municipal court and on de novo review at the Law Division for refusing to submit to the test under N.J.S.A. 39:4-50.4(a), and we affirmed. Ibid.

Our Supreme Court reversed, finding both the refusal statue and the implied consent statute, N.J.S.A. 39:4-50.2, "require proof that law enforcement officials inform motorists of the consequences of refusal by conveying information in a language the person speaks or understands . . . ." Ibid. This conclusion rested on an analysis of the legislative intent behind both statutes and

the plain meaning of "inform." Id. at 499-500 and 506-07. The Court summarized the refusal statute as a requirement for officers to request drivers to submit to a test and the implied consent statute as guiding officers on how to make that request. Id. at 501.

The Court determined when the statutes are read together, a conviction requires the officer to both request the test and inform the defendant of consequences of refusal. Id. at 503. The directive that officers "inform" meant "they must convey information in a language the person speaks or understands." Id. at 507. Even though the conviction was reversed, the Court cautioned the statutes should not be read to require the State prove a defendant's subjective understanding of the warnings, only whether the defendant was "properly informed in a language they speak or understand . . . ." Id. at 513.

Defendant argues the same concerns animating Marquez "should be extended to non-exigent situations in which a Spanish-speaking individual is about to be placed under warrantless arrest." The Court in Marquez acknowledged where motorists did not speak English, "some other effort must be made" to inform them of the consequences of refusal to submit to an alcohol breath test, but it deferred to the Motor Vehicle Commission "to fashion a proper remedy with the assistance of the Attorney General." 202 N.J. at 510-11. See

also State v. Mejia, 141 N.J. 475, 503 (1995) (encouraging the Attorney General to develop bilingual Miranda warnings).

Unlike the informed consent and refusal statutes at issue in Marquez, the resisting arrest and obstruction statutes do not place affirmative duties on police officers, except in the case of the "announcement requirement," which as we discussed above, applies only to unlawful arrests. Additionally, as we have previously recognized, arrests are fluid in nature, and detentions often pose safety risks. See, e.g., State v. Witt, 223 N.J. 409, 411 (2015) (recognizing, in the context of obtaining telephonic warrants, concerns about the "safety of police officers and a car's driver and occupants detained on the side of a heavily traveled highway or road"). It would be unreasonable to do what defendant suggests and broaden the holding in Marquez to all roadside detentions. The Supreme Court has not imposed such an obligation in its case law. See Witt, 223 N.J. at 414-15 (complicated exigent-circumstances tests "do[] not provide greater liberty or security to New Jersey's citizens and . . . place[] on law enforcement unrealistic and impracticable burdens" where officers are handling "fast-moving and evolving events that require prompt action").

III.

Finally, defendant renews his prior challenges to his sentencing, namely (1) the court violated proportionality by imposing a fine for a traffic offense higher than the fine for each of the disorderly persons charges; (2) the court failed to give adequate reasons on the record for the sentence under N.J.S.A. 39:3-10 because State v. Moran, 202 N.J. 311, 328-29 (2010), required the court to consider a number of factors before imposing the maximum punishment; and (3) the court should have dismissed the minor charges and merged the resisting arrest charge with the obstruction of justice charge.

Fines levied for convictions of disorderly persons offenses are statutorily capped at $1,000. N.J.S.A. 2C:43-3. The fine for driving without a license is also statutorily prescribed. N.J.S.A. 39:5-31. Where the Legislature has prescribed penalties, "courts will not interfere . . . unless it is so clearly arbitrary and without rational relation to the offense or so disproportionate to the offense as to transgress the Federal and State constitutional prohibitions against excessive fines or cruel and unusual punishment." State v. Smith, 58 N.J. 202, 211 (1971) (citing U.S. Const. amend. VIII; N.J. Const. art. I, § 12). No such showing of excessive or cruel punishment is made here, and so defendant's proportionality argument as to the monetary fines must fail.

Defendant's challenge to the suspension of his driving privileges misapprehends the statutory scheme applied by the court. Authority and procedure for a court's revocation of driving privileges comes from multiple sources: the Criminal Code, the Motor Vehicle Code and case law construing it, and for convictions for driving without a license, the specific provision of the Motor Vehicle Code found in N.J.S.A. 39:3-10(u).

N.J.S.A. 2C:43-2(c) authorizes the court to suspend the driving privileges of a person convicted of a disorderly persons offense "in the course of which a motor vehicle was used." The court is required to "consider the circumstances of the violation, and whether the loss of driving privileges will result in extreme hardship and alternative means of transportation are not readily available." N.J.S.A. 2C:43-2(c). The court is also required to "state on the record the reasons for imposing the sentence" as well as its findings related to any aggravating and mitigating factors under N.J.S.A. 2C:44-1 to -3, which applies to impositions of terms of imprisonment or probation as well as fines levied in addition to sentences of imprisonment or probation. N.J.S.A. 2C:43-2(e).

Separately, N.J.S.A. 39:5-31 permits the court to revoke a person's driver's license "where such person shall have been guilty of such willful violation of any of the provisions of [the Motor Vehicle Code] as shall, in the discretion of

the magistrate, justify such revocation." In Moran, our Supreme Court addressed the meaning of "willful violation" in the context of a conviction under N.J.S.A. 39:4-96, the reckless-driving statute. 202 N.J. at 324. The Court distinguished willful violations from other violations as "a matter of degree" to "ensure that municipal court judges invoke N.J.S.A. 39:5-31 only in . . . cases that present aggravating circumstances." Ibid. The Court issued a directive to municipal and Law Division judges to consider the following factors before imposing a license suspension:

> the nature and circumstances of the defendant's conduct, including whether the conduct posed a high risk of danger to the public or caused physical harm or property damage; the defendant's driving record, including the defendant's age and length of time as a licensed driver, and the number, seriousness, and frequency of prior infractions; whether the defendant was infraction-free for a substantial period before the most recent violation or whether the nature and extent of the defendant's driving record indicates that there is a substantial risk that he or she will commit another violation; whether the character and attitude of the defendant indicate that he or she is likely or unlikely to commit another violation; whether the defendant's conduct was the result of circumstances unlikely to recur; whether a license suspension would cause excessive hardship to the defendant and/or [dependents]; and the need for personal deterrence.
>
> [Id. at 328-29.]

Additionally, the Court mandated the judge "articulate the reasons for imposing a period of license suspension" as "a further safeguard against arbitrariness in sentencing." Id. at 329 (citing State v. Miller, 108 N.J. 112, 122 (1987)).

Finally, N.J.S.A. 39:3-10(u) describes the appropriate penalties for driving without a license, stating:

> A person violating this section shall be subject to a fine not exceeding $500 or imprisonment in the county jail for not more than [sixty] days, but if that person has never been licensed to drive in this State or any other jurisdiction, the applicant shall be subject to a fine of not less than $200 and, in addition, the court shall issue an order to the commission requiring the commission to refuse to issue a license to operate a motor vehicle to the person for a period of not less than 180 days.

Defendant argues the court was required to find aggravating and mitigating factors prior to imposing a six-month suspension of his driving privileges and the maximum statutory fine. Defendant relies on Moran to support his contention. Defendant's argument conflates suspensions imposed under the Criminal Code with those imposed under the Motor Vehicle Code. Although defendant was ultimately convicted of disorderly-persons offenses, it could not fairly be said that "a motor vehicle was used" when he purportedly resisted arrest or obstructed justice simply because these offenses were

committed after a roadside detention. Further, no imprisonment, probation, or fine in connection with imprisonment or probation was at issue, so an assessment of aggravating and mitigating factors under N.J.S.A. 2C:44-1 to -3 was not required.

Rather, the suspension was issued in connection with defendant's proven violations of the Motor Vehicle Code, which included N.J.S.A. 39:3-10. If the court had revoked defendant's privileges based only on the speeding or obstructed view violations, then the court would have been required to make the individualized finding using the factors in Moran to determine whether defendant committed "willful violations." However, because defendant was also convicted under N.J.S.A. 39:3-10, and because there was no evidence he had ever been a licensed driver in any jurisdiction, a fine in excess of $200 and a six-month suspension was statutorily mandated by N.J.S.A. 39:3-10(u).

Therefore, even though an individualized Moran analysis normally applies to any suspension imposed because of a motor vehicle violation, in this case, the six-month suspension was a statutorily mandated outcome. Further, this suspension would have lapsed even before the trial de novo before the Law Division, and so defendant's challenge is moot. To the extent defendant is only challenging the monetary penalty levied, a Moran analysis applies only to the

suspension, not the imposition of a monetary penalty. The $507 fine levied was properly greater than the $200 minimum.

Our careful review of the record reveals defendant's remaining arguments lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2). We therefore vacate the conviction and sentence for resisting arrest, N.J.S.A. 2C:29-2(a), and affirm the convictions and sentences for speeding, N.J.S.A. 39:4-38; driving without a license, N.J.S.A. 39:3-10; and obstruction of windshield for vision, N.J.S.A. 39:3-74; as well as the summons for disorderly persons obstruction of administration of justice, N.J.S.A. 2C:29-1(a).

Affirmed in part, vacated in part, and remanded for modification of the judgment of conviction. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION